[L.A. No. 31359. Sept. 10, 1981.]

HIGHLAND RANCH, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

Counsel

Robert P. Roy, Dressler, Stoll, Quesenbery, Laws & Barsamian, Dressler, Stoll, Hersh & Quesenbery, Charley M. Stoll, Marion I. Quesenbery and Pieter Van Leuven for Petitioner.

Ellen Lake, Manuel M. Medeiros, Daniel G. Stone, Edwin F. Lowry and Jorge A. Leon for Respondent.

George T. Tichy II, Robert K. Carrol and Littler, Mendelson, Fastiff & Tichy as Amici Curiae on behalf of Respondent.

Dianna Lyons, Daniel A. Garcia, Marco E. Lopez, Carlos M. Alcala, Francis E. Fernandez, Carmen S. Flores, Federico G. Chavez, Ellen J. Eggers, Jerome Cohen, Sanford N. Nathan, William H. Carder, Tom Dalzell and Ellen Greenstone for Real Party in Interest.

Opinion

**TOBRINER, Acting C. J.**—In this case Highland Ranch (Highland), an agricultural employer, seeks review of a final order of the Agricultural Labor Relations Board (ALRB or Board), finding Highland guilty of a number of unfair labor practices arising out of a series of incidents which occurred in the latter half of 1977, shortly after the United Farm Workers of America, AFL-CIO (UFW or union) had apparently won a decisive victory in a representation election held among Highland's employees. Although Highland has objected to a number of the ALRB's unfair labor practice findings, the most prominent issue raised by Highland concerns the propriety of the ALRB's determination that Highland was guilty of an unfair labor practice in failing either to provide pertinent information to or to bargain with the union during the time period between the union's apparent election victory and the ALRB's formal certification of the union.

In reaching its decision, the ALRB relied upon a series of federal authorities which hold that, under the National Labor Relations Act (NLRA), an employer acts "at its peril" in undertaking unilateral action altering the working conditions of its employees during the pendency of an election challenge. Under these federal decisions, an employer may be found guilty of an unfair labor practice in failing to

bargain prior to effecting such a change in working conditions if, as in the instant case, the union's election victory is ultimately sustained. The ALRB followed these decisions in concluding that Highland had committed an unfair labor practice in the instant case.

Highland argues, however, that the federal precedents upon which the ALRB relied should not be controlling under the Agricultural Labor Relations Act (ALRA) in light of Labor Code section 1153, subdivision (f), a provision of the ALRA which has no counterpart in the NLRA.[1] Highland maintains that section 1153, subdivision (f) *prohibits* an employer from bargaining with a union that is not formally certified under any circumstances. Accordingly, Highland asserts that the ALRB could not properly find that it had committed an unfair labor practice in failing to bargain with the union prior to the union's actual certification.

The ALRB rejected Highland's proposed interpretation of section 1153, subdivision (f) as incompatible with the legislative purpose underlying the section, finding that the Legislature had enacted that provision simply to preclude an employer from entering into a "sweetheart arrangement" with a union that had not been selected by its employees in a representation election. In light of this purpose, the Board concluded that the section could not properly be interpreted to prohibit an employer from bargaining with an apparently victorious union during the pendency of an election challenge.

For the reasons discussed below, we have concluded that the ALRB properly held Highland responsible for its failure to inform or bargain with the union in this case, but we base our conclusion upon narrower grounds than those relied upon by the ALRB. As we shall explain, in view of the particular facts of the instant case, we have concluded that we need not determine whether—as under the NLRA—an employer under the ALRA acts "at its peril" *whenever* it takes unilateral action altering the working conditions of employees during the pendency of an election challenge, without regard to the reasonableness and good faith of the employer's doubts as to the validity of the union's election victory.

As we shall see, in the present case Highland failed to inform or bargain with the union at a time at which Highland could entertain no

---

[1]Unless otherwise indicated, all statutory references are to the Labor Code.

reasonable doubt that the union would be certified as its employees' bargaining representative, because the imminent certification of the union was simply a ministerial act. Under these circumstances, we conclude that it would clearly defeat the purposes of the act to permit an employer to invoke the provisions of section 1153, subdivision (f) as a shield to immunize its failure to bargain with the union over the impending changes in the workers' employment status. Accordingly, we uphold the ALRB's unfair labor practice finding in this case.

1. *The facts and proceedings below.*

For many years prior to 1977, Highland was engaged in farming operations at a 647-acre ranch leased from the United States Marine Corps at Camp Pendleton in Orange County. Highland grew tomatoes, cauliflower, cabbage, cucumbers and corn at the ranch, and operated a packing shed on the premises. Many of the agricultural laborers who worked at the ranch lived in a rent-free labor camp owned and run by Highland.

Some time in the spring of 1977, the UFW began an organizational drive among Highland's employees. As the months passed, the union's campaign activity increased and, early in June 1977, Highland, with knowledge of the union's activity, announced a new set of work rules which increased existing benefits and created some new benefits. Thereafter, the union's organizational campaign activity continued unabated and on July 21, 1977, the UFW filed a petition for certification, triggering the ALRA's election process. Pursuant to the speedy election procedures prescribed by the act, the ALRB directed that an election be held on July 28, 1977.

On the day of the election, Highland's officers sought to deny the ALRB's election officials access to the ranch. When the public officials insisted on their lawful right to conduct the election, Highland had the agency officials arrested in the presence of its workers. At the subsequent ALRB proceedings, the Board found that Highland engaged in serious election day misconduct; Highland has not sought review of the unfair labor practice findings relating to that misconduct.

Despite Highland's interference, the representation election was held on July 28. No other union contested the UFW in the election, and, pursuant to statutory directive, the workers were given a ballot choice between the UFW and "no labor organization." (§ 1156.3, subd. (a).)

Of 203 ballots cast in the election, 187 were in favor of the UFW, 14 were in favor of no union, and 2 resulted in unresolved challenges.

Under section 1156.3, subdivision (d) if no objections are filed within five days of a representation election "the board shall certify the election." In this case, however, four days after the election Highland filed a petition with the ALRB seeking to have the election set aside on two grounds. First, Highland argued that the ALRB lacked jurisdiction to hold the election because the ranch was located on property leased from the federal government. Second, Highland maintained that the Board agents had committed acts of misconduct by interfering with a fair election.

On November 2, 1977, three months after the election challenges had been filed, the executive secretary of the ALRB issued an order dismissing the challenges on the ground that the supporting declarations, even if true, did not set forth facts which would constitute grounds to deny certification to the union. (See Cal. Admin. Code, tit. 8, § 20365, subds. (c), (e), (h); *J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 12-18 [160 Cal.Rptr. 710, 603 P.2d 1306].) Under the Board's regulations, Highland had the right to obtain ALRB review of the executive secretary's dismissal of its objections by filing a request for review within five days of receiving service of the dismissal. (Cal. Admin. Code, tit. 8, §§ 20365, subds. (e), (h); 20393, subd. (a).) Highland, however, did not seek review of the dismissal of its election challenges, and thereafter, as a matter of course (Cal. Admin. Code, tit. 8, § 20380),[2] on November 29, 1977, the Board certified the election and the UFW as the exclusive bargaining representative of Highland's agricultural employees.

As noted at the outset, the principal legal issue in this case concerns the consequences which should attach to certain actions of Highland during the period between the election on July 28, 1977, and the Board's official certification of the UFW on November 29, 1977.

In late September 1977, less than two months after the election, Highland's president contacted Deardoff-Jackson Company, a separate

---

[2]Section 20380 provides in relevant part: "*The executive secretary shall issue certification of the election* after a secret ballot election conducted pursuant to this part: ... (b) If objections to the conduct of the election are filed ... upon resolution of objections pursuant to Section 20365 ... *after expiration of the period for requests for review under Section 20393* ...." (Italics added.)

California corporation engaged in farming operations, to inquire whether Deardoff-Jackson was interested in purchasing the Highland farming operation. Deardoff-Jackson indicated its interest and by mid-November Highland and Deardoff-Jackson had had some 12 substantive discussions about the sale of the ranch. By this time, Deardoff-Jackson had formed San Clemente Ranch, Ltd. (San Clemente), a limited partnership with Deardoff-Jackson as general partner, to purchase and operate the ranch. Under the agreement between Highland and San Clémente, San Clemente obtained the full assignment of Highland's land lease and purchased virtually all of Highland's ranch facilities, machinery and equipment.

Originally, San Clemente was to take possession of the ranch and its facilities on December 15, 1977. The tomato harvest at Highland was completed earlier than expected, however, and the parties agreed to advance the date of San Clemente's takeover to December 1, 1977. Highland's president signed the final escrow papers for the sale on November 29, 1977, the same day that the ALRB formally certified the UFW as Highland's exclusive bargaining representative. The sale of the ranch was completed the following day when San Clemente's officers signed the escrow papers.

Throughout the period from late September to the end of November, while it was in the process of selling the ranch, Highland failed to provide the UFW with any information whatsoever concerning the impending sale. The UFW apparently first learned of the sale on November 29 and at that time the union made strenuous efforts to contact Highland to discuss the effects of the sale upon the Highland employees.

A meeting was finally arranged between the union and Highland's attorneys on December 2. By that time, Highland had given all of its employees layoff notices, effective November 30, and had already closed its labor camp, ousting the workers who had resided at the camp from their homes. At the December 2 meeting, the UFW presented the union's standard "Request for Information" and posed numerous questions regarding the identity of, and Highland's relationship to, the buyer. In addition, the union presented three specific demands: (1) the reopening of the labor camp pending the rehiring of the workers who lived in the camp; (2) severance pay for those employees who had worked for Highland over the three previous months; and (3) a specified contribution to the union's Martin Luther King, Jr., Fund. After conferring, Highland's attorneys rejected the first two demands, and

stated that they would take the third under submission. Highland did not subsequently respond to the third demand and, despite further requests by the union, Highland has never provided the information requested by the union's standard Request for Information.

Prior to Highland's sale of the ranch, the union had filed several unfair labor practice charges against Highland objecting to numerous disciplinary actions Highland had allegedly taken against prounion employees in the summer and fall of 1977. On November 7, 1977, the ALRB's general counsel—after investigating the charges—filed an initial unfair labor practice complaint against Highland on the basis of some of these charges. After Highland completed the sale of the ranch without notifying the union or bargaining over the effects of the sale on its employees, the general counsel amended the complaint to charge these additional actions as unfair labor practices.

In the subsequent administrative proceedings, both the administrative law officer and the ALRB found that Highland's conduct in failing to notify and bargain with the union constituted an unfair labor practice. To remedy the employer's violation, the ALRB issued an order directing Highland to bargain with the UFW over the effects of the sale on its employees; in line with the applicable federal authorities, the ALRB accompanied its bargaining order with a "limited backpay" remedy designed to help effectuate the bargaining requirement. In this proceeding, Highland challenges both the validity of the unfair labor practice finding and the nature of the remedy imposed. We discuss each of these issues in turn.

2. ▪ *The ALRB properly found that Highland was guilty of an unfair labor practice in failing to notify or to bargain with the union over the effects of its decision to sell the ranch.*

As our court has frequently noted, the ALRA was modeled largely upon the provisions of the NLRA. (See, e.g., *Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 318 [172 Cal. Rptr. 720, 625 P.2d 263]; *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556 [147 Cal.Rptr. 165, 580 P.2d 665].) As a consequence, under traditional legal principles our court would, of course, look to established administrative and judicial interpretations of the federal act as persuasive indicants of the appropriate interpretation of the state legislation. (See, e.g., *Englund* v. *Chavez* (1972) 8 Cal.3d 572, 589-590 [105 Cal.Rptr. 521, 504 P.2d 457]; *Petri*

*Cleaners, Inc.* v. *Automobile Employees, etc., Local No. 88* (1960) 53 Cal.2d 455, 459 [2 Cal.Rptr. 470, 349 P.2d 76].) In enacting the ALRA, moreover, the Legislature in essence codified this familiar canon of statutory construction with respect to the ALRB, providing explicitly in section 1148 that "[t]he [ALRB] shall follow applicable precedents of the National Labor Relations Act, as amended." Accordingly, in evaluating the propriety of Highland's conduct, the ALRB quite naturally looked initially to the governing NLRA precedents.

As the ALRB recognized, the facts of this case bring into play two separate lines of federal authority. First, the federal precedents establish that while an employer is not normally obligated to bargain towards a comprehensive collective bargaining agreement during the period of time its challenges to a representation election are pending before the National Labor Relations Board (NLRB) (see, e.g., *Sundstrand Heat Transfer, Inc.* v. *N.L.R.B.* (7th Cir. 1976) 538 F.2d 1257, 1259), an employer is not free unilaterally to change the terms or conditions of employment during this period of time with impunity. Rather, the federal cases hold that when an employer makes such changes without notifying the union and without giving the union some opportunity to be heard on the proposed changes, the employer acts "at its peril" and if the union's apparent election victory is subsequently sustained, the employer may be held to have committed an unfair labor practice for undertaking such unilateral action.

The NLRB has explained the rationale behind its well-established rule as follows: "The Board has long held that, absent compelling economic considerations for doing so, an employer acts at its peril in making changes in terms and conditions of employment during the period that objections to an election are pending and the final determination has not been made. . . . Such changes have the effect of bypassing, undercutting, and undermining the union's status as the statutory representative of the employees in the event a certification is issued. To hold otherwise would allow an employer to box the union in on future bargaining positions by implementing changes of policy and practice during the period when objections or determinative challenges to the election are pending . . . ." (*Mike O'Connor Chevrolet* (1974) 209 N.L.R.B. 701 [85 L.R.R.M. 1419, 1424-1425], revd. on other grounds (8th Cir. 1975) 512 F.2d 684; see, e.g., *General Electric Co., Battery Prod., Cap. Dept.* v. *N. L. R. B.* (5th Cir. 1968) 400 F.2d 713, 717-719; *N. L. R. B.* v. *Laney & Duke Storage Whse. Co.* (5th Cir. 1966) 369 F.2d 859, 866.)

A second line of federal cases demonstrates the applicability of this doctrine to a case, such as the present one, in which the "unilateral change" implemented by the employer during the election challenge is a decision to terminate the bargaining unit employees' jobs through a sale or other termination of the business. In this regard, the federal cases hold that although an employer is under no obligation to bargain with the union in making the fundamental managerial decision of whether or not to go out of business (see *Textile Workers* v. *Darlington Co.* (1965) 380 U.S. 263, 269-274 [13 L.Ed.2d 827, 833-836, 85 S.Ct. 994]), "[o]nce such a decision is made the employer is still under an obligation to notify the union of its decision so that the union may be given the opportunity to bargain over the rights of the employees whose employment status will be altered by the managerial decision. . . . Such bargaining over the 'effects' of the decision on the displaced employees may cover such subjects as severance pay, vacation pay, seniority, and pensions, among others, which are necessarily of particular importance and relevance to the employees." (*N. L. R. B.* v. *Transmarine Navigation Corporation* (9th Cir. 1967) 380 F.2d 933, 939; *Cooper Thermometer Company* v. *N. L. R. B.* (2d Cir. 1967) 376 F.2d 684, 688. See also *First National Maintenance Corp.* v. *N.L.R.B.* (1981) — U.S. —, — [69 L.Ed.2d 318, 101 S.Ct. 2573].)

The federal authorities explicitly recognize that this obligation to bargain over the "effects" of a decision to terminate operations applies when the employer's decision is reached during the pendency of election objections. (See, e.g., *N.L.R.B.* v. *W. R. Grace & Co., Const. Products* (5th Cir. 1978) 571 F.2d 279, 282, enforcing 230 N.L.R.B. 617 [95 L.R.R.M. 1459]; *West Coast Schools* (1974) 208 N.L.R.B. 725, 727 [85 L.R.R.M. 1257].) The ALRB followed these federal authorities in finding Highland guilty of an unfair labor practice in the instant case.

In objecting to the ALRB's ruling, Highland does not challenge the Board's reading of the federal precedents but instead contends that the federal authorities should not be followed in light of the provisions of section 1153, subdivision (f), a section of the ALRA that has no direct counterpart in the NLRA. Section 1153 enumerates the various employer unfair labor practices under the ALRA, and subdivision (f) provides that it shall be an unfair labor practice for an agricultural employer "[t]o recognize, bargain with, or sign a collective bargaining agreement with any labor organization not certified pursuant to the

provisions of this part." Highland contends that under subdivision (f) it was in fact *prohibited* from bargaining with the UFW prior to the union's formal certification, and thus that it cannot be found to have acted improperly in making unilateral changes without notice to or bargaining with the union.

The ALRB rejected Highland's proposed interpretation of section 1153, subdivision (f), concluding that that unfair labor practice provision was never intended to authorize an employer to make unilateral changes in working conditions between an election and certification but rather was enacted for an entirely different purpose. Quoting from an earlier ALRB decision, rendered in April 1977—nearly six months before the incidents at issue in this case—the ALRB observed that "[*t*]*he prohibition against an employer's recognizing [or bargaining with] an uncertified union is clearly directed, not towards an arbitrary time limit on bargaining, but towards preventing voluntary recognition of labor organizations.* The facts in Englund v. Chavez [(1972)] 8 Cal.3d 572 [involving employer favoritism toward one of two competing unions prior to the adoption of secret ballot election procedures] are too much a part of the history leading to the enactment of the ALRA for us to consider 1153(f) as anything but a guarantee of freedom of choice to agricultural employees through the machinery of secret ballot elections. The prohibition against bargaining with an uncertified union does not and should not preclude bargaining with a union that has been chosen through a secret ballot election." (Italics added.) (*Kaplan's Fruit & Produce Co., Inc.* (1977) 3 A.L.R.B. No. 28, p. 7.) Accordingly, the ALRB concluded that in this case section 1153, subdivision (f) could not properly be invoked by Highland to insulate it from responsibility for its unilateral actions prior to the union's formal certification.

Highland challenges the ALRB's interpretation of section 1153, subdivision (f), urging our court to reject the agency's construction of the provision and instead to adopt a literal interpretation of the subdivision which would prohibit an employer from bargaining with a union that was not yet formally certified *under any circumstances.* In suggesting this strictly literalistic reading, Highland ignores two fundamental principles of statutory construction. First, and most significantly, Highland's approach contravenes the basic precept which teaches that "the object of all construction of statutes is to ascertain and give effect to the intention of the legislature. . . . In the analysis of statutes for the purpose of finding legislative intent, regard is to be had not so much as to the exact phraseology in which the intent has been expressed as to

the general tenor and scope of the entire scheme embodied in the enactments.... [T]he obvious design of the law should not be sacrificed to a literal interpretation of such language." (*County of Los Angeles* v. *Frisbie* (1942) 19 Cal.2d 634, 639 [122 P.2d 526]; see, e.g., *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal. Rptr. 761, 502 P.2d 1049]; *Dickey* v. *Raisin Proration Zone No. 1* (1944) 24 Cal.2d 796, 802 [151 P.2d 505, 157 A.L.R. 324].)

Second, Highland minimizes the significance to be accorded an administrative agency's interpretation of a statute within its sphere of expertise. Although the ultimate interpretation of legislation rests, of course, with the courts, both this court and the United States Supreme Court have recognized on numerous occasions that "[t]he construction of a statute by the officials charged with its administration must be given great weight, for their 'substantially contemporaneous expressions of opinion are highly relevant and material evidence of the probable general understanding of the times and of the opinions of [persons] who probably were active in the drafting of the statute.'" (*Whitcomb Hotel, Inc.* v. *Cal. Emp. Com.* (1944) 24 Cal.2d 753, 756-757 [151 P.2d 233, 155 A.L.R. 405]; see, e.g., *County of Los Angeles* v. *Frisbie, supra,* 19 Cal.3d 634, 643; *White* v. *Winchester Club* (1942) 315 U.S. 32, 41 [86 L.Ed. 619, 625, 62 S.Ct. 425].)

In the present case, the ALRB—drawing upon its familiarity with the history of the ALRA and the "general understanding of the times" —concluded that section 1153, subdivision (f) was adopted for the purpose of prohibiting an employer from entering into a "sweetheart" arrangement with one of two or more competing unions, and to make it clear that under the ALRA, unlike the NLRA, an exclusive bargaining representative may be designated only on the basis of a secret representation election, and not by the presentation of union authorization cards or any other less reliable method sanctioned under federal law.

The available legislative history supports the ALRB's view of the general legislative purpose underlying section 1153, subdivision (f). In the legislative hearings on the bills that ultimately were enacted as the ALRA, the proponents of the legislation repeatedly stressed that the act would "only allow one way of recognition and that's through a secret ballot election. We don't allow recognitional strikes [and] we don't allow authorization cards as they do under the NLRA...." (Hearing before Sen. Ind. Rel. Com. on Sen. Bill No. 1 (Third Ex. Sess., May 21, 1975) p. 51 (testimony of Rose Bird, Sect. of Agriculture and Services

Agency.).) "Recognition ... cannot be obtained by sweetheart contracts. It can only be obtained by the workers going into the voting booth and selecting a union of their choice or rejecting any union, should they choose." (Hearing before Assem. Lab. Relations Com. on Assem. Bill No. 1533 (May 12, 1975) p. 2 (remarks of Assemblyman Berman).)

Although the hearings themselves contain no direct reference to section 1153, subdivision (f) as such, a law review article written contemporaneously with the adoption of the ALRA by a law professor who served as a labor law consultant to the Agricultural and Services Agency in the drafting of the act describes the purpose of the section in terms that are generally consistent with the ALRB's interpretation. (Levy, *The Agricultural Labor Relations Act of 1975—La Esperanza de California Para el Futuro* (1975) 15 Santa Clara Law. 783, 789-790.) The article states: "One new provision contained in the ALRA makes it an unfair labor practice for an employer to recognize, bargain with, or sign a collective bargaining agreement with any labor organization not certified pursuant to the Act [citing section 1153, subdivision (f)]. This section ties in with the election procedure of the Act, which specifies that the sole means by which a labor organization can achieve certification as a bargaining representative is to win a secret ballot election conducted by the board. These sections thus prohibit voluntary recognition of a labor organization by an employer based on authorization cards signed by the employees and presented by the labor organization, a practice permitted by decisions interpreting the NLRA. The ALRA's certification procedure reflects the feeling that the best method for determining the employees' choice of a bargaining representative is via the secret ballot election." (*Ibid.*) (Fns. omitted.)

These indicia of legislative intent do support the ALRB's conclusion that the principal purpose behind section 1153, subdivision (f) was to protect employee rights by preventing an employer from dealing with a union that has not been selected by its workers through the ALRB's secret election process, rather than to relieve an employer of an otherwise applicable duty to bargain with an employee-chosen union. It does not necessarily follow, however—as the ALRB's decision in this case perhaps suggests—that section 1153, subdivision (f) places no constraints whatsoever upon an employer's bargaining with a union *in every case* in which the union has emerged apparently victorious from the polling booth.

In establishing a procedure through which objections to the initial election result may be voiced (§ 1156.3, subd. (c)), the ALRA implicitly recognizes that at least in some instances the initial counting of ballots may, for a variety of reasons, not represent a valid expression of the desires of the affected workers. The ALRA protects the right of employees to select between competing unions and also to choose not to be represented by a union as well as to be so represented. (§ 1152.) Hence, when employees or an employer level objections at an election that are sufficiently serious to cast reasonable doubt upon whether a union's initial victory will ultimately be sustained, section 1153, subdivision (f) may bear upon the situation. When the employer can establish that it entertained a good faith, reasonable doubt as to the representative status of a union that has not yet been formally certified by the ALRB, the proscriptions of section 1153, subdivision (f) may preclude a ruling that the employer acted "at its peril" in refusing to bargain with a presumptively victorious union during the period of an election challenge. (Cf. *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d 1, 30-35.)

In the instant case, however, Highland cannot properly claim that its failure to inform or bargain with the union over the effects of its decision to sell the ranch rested upon any such reasonable belief that the union would not in fact be certified as its employees' bargaining representative. Even if we assume that the election objections filed by Highland in the beginning of August 1977 were not frivolous on their face and were not interposed by the employer simply to forestall its obligation to bargain with the union, by mid-November 1977 when its decision to sell the ranch was firmly established Highland could not reasonably doubt that the UFW would be certified.

As we have seen, on November 2, 1977, the executive secretary of the ALRB dismissed Highland's election objections as groundless. Thereafter, Highland did not request the ALRB to review the dismissal within the five-day period authorized by the administrative regulations. Under the governing regulations, once that period for requesting review by the ALRB had expired, the issuance of a formal certification of the union's representative status became a mere ministerial act. (See fn. 2, *ante.*) Consequently, by mid-November Highland could entertain no reasonable doubt that the union would in fact be certified.

Under these circumstances, we conclude that Highland may not excuse its failure to inform or bargain with the union by reference to

section 1153, subdivision (f). Just as an employer cannot properly rely upon the absence of formal certification to escape a duty to bargain when it has precluded certification by filing election objections in bad faith (cf. *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at pp. 31-32, 39), so an employer may not seize upon the absence of formal certification when it can entertain no reasonable doubt that the union which has prevailed in a representative election will in fact be certified. To permit an employer to make unilateral changes in the working conditions of its employees at such a time would clearly undermine the integrity of the election result and would defeat, rather than advance, the legislative purpose of protecting the employees' choice which underlies section 1153, subdivision (f).

Accordingly, we conclude that on the facts of this case the ALRB properly held that Highland had engaged in an unfair labor practice in refusing to notify the union of its decision to sell the ranch and in refusing to bargain over the effects of that decision on its employees.

3. ■ *The ALRB properly imposed a "limited backpay" remedial order sanctioned by the applicable NLRA precedents.*

Having concluded that the ALRB properly found Highland guilty of an unfair labor practice in this regard, we must determine the propriety of the ALRB's remedial order. In its order, the ALRB directed Highland to bargain with the UFW over the effects of its decision to sell the business. At the same time, the Board concluded that because of Highland's changed position and the employees' lack of any present economic bargaining power vis-à-vis Highland, a bargaining order, standing alone, would not adequately remedy the unfair labor practice in this case. Accordingly, in order to effectuate the bargaining order and to help ensure that Highland would not profit from its unfair labor practice, the ALRB accompanied its bargaining order with a "limited back pay" requirement that the NLRB has traditionally imposed to remedy comparable violations under the federal act. (See, e.g., *Transmarine Navigation Corp.* (1968) 170 N.L.R.B. 389 [67 L.R.R.M. 1419]; *N. L. R. B.* v. *W. R. Grace & Co., Const. Products, supra,* 571 F.2d 279, 283 & fn. 6.)[3]

---

[3]In this regard, the ALRB decision provides: "In accord with the remedy developed by the NLRB for this type of violation (*Transmarine Navigation Corporation, supra*), we will order Highland to pay to its agricultural employees their daily wages as of November 28, 1977, from five days after the issuance of this Decision until: (1) the date

The NLRB fully explained the rationale for this type of remedial order in its seminal *Transmarine* decision, observing: "It is apparent that, as a result of the [employer's] unlawful failure to bargain about [the] effects [of its termination of employment], the [employees] were denied an opportunity to bargain through their . . . representative at a time prior to the shutdown when such bargaining would have been meaningful in easing the hardship on employees whose jobs are being terminated. . . . [¶] Under the circumstances of this case . . . it is impossible to reestablish a situation equivalent to that which would have prevailed had the [employer] more timely fulfilled its statutory bargaining obligation. In fashioning an appropriate remedy, we must be guided by the principle that the wrongdoer, rather than the victims of the wrongdoing, should bear the consequences of his unlawful conduct, and that the remedy should 'be adapted to the situation that calls for redress.'" (170 N.L.R.B. at p. 389 (quoting *Labor Board* v. *Mackay Co.* (1938) 304 U.S. 333, 348 [82 L.Ed. 1381, 1391, 58 S.Ct. 904]).)

The NLRB continued: "Applying these principles to the instant case, we deem it necessary, in order to effectuate the purposes of the Act, to require the [employer] to bargain with the Union concerning the effects of the shutdown on its [former employees]. Under the present circumstances, however, a bargaining order alone cannot serve as an adequate remedy for the unfair labor practices committed by the [employer]. As we recently pointed out in Royal Plating and Polishing Co., Inc. [(1966) 160 N.L.R.B. 990, 997]: 'The Act required more than pro forma bargaining, but pro forma bargaining is all that is likely to result unless the Union can now bargain under conditions essentially similar to those that would have obtained, had [the employer] bargained at the time the Act required it to do so. If the Union must bargain devoid of all economic strength, we would perpetuate the situation created by [the employer's] deliberate concealment of relevant facts from the Union which prevented the Union from meaningful bargaining.'" (*Id.*, at p. 390.)

---

Highland bargains to agreement with the UFW about the impact of its decision to close the business; or (2) the date Highland and the UFW bargain to a bona fide impasse; or (3) the failure of the UFW, to request bargaining within five days after issuance of this Decision or to commence negotiations within five days after Highland's notice of its desire to bargain; or (4) the subsequent failure of the UFW to bargain in good faith. In no event shall the back pay period exceed the period of time necessary for the employees to obtain alternative employment and, for those employees who were evicted from the labor camp, to obtain other, comparable housing."

Under these circumstances, the NLRB determined in *Transmarine* that "[i]n order to assure meaningful bargaining and to effectuate the purposes of the Act, we shall accompany our order to bargain over the effects of the shutdown with a limited backpay requirement designed both to make whole the employees for losses suffered as a result of the violation and to recreate in some practicable manner a situation in which the parties' bargaining position is not totally devoid of economic consequences for the [employer]." (*Ibid.*)

The limited backpay remedy that the NLRB adopted in *Transmarine* imposed a prospective requirement upon the employer to pay each terminated employee a daily sum equal to the employee's former wages during the mandated bargaining process. The order additionally provided that the employer's "limited backpay" obligation would terminate as soon as (1) the parties reached agreement on the issues subject to bargaining, (2) the parties bargained to a bona fide impasse or (3) the union failed to bargain in good faith. Finally, the NLRB also placed an absolute ceiling on the employer's potential monetary obligations under the order, specifying that in no event should any employee receive daily payments for a period of time exceeding the period it had taken the employee to obtain alternative employment after his termination.[4]

Since the *Transmarine* decision in 1968, the NLRB has imposed virtually identical limited backpay remedial orders in numerous cases in which an employer failed to bargain with a union over the effects of its decision to go out of business (see, e.g., *J. B. Enterprises* (1978) 237 N.L.R.B. 383 [99 L.R.R.M. 1432, 1433]; *Van's Packing Plant* (1974) 211 N.L.R.B. 692 [86 L.R.R.M. 1581]; *West Coast Schools, supra,* 208 N.L.R.B. 725, 727-728 [85 L.R.R.M. 1257]; *Walter Pape, Inc.* (1973) 205 N.L.R.B. 719, 720-721 [84 L.R.R.M. 1055]; *Interstate Tool Co., Inc.* (1969) 177 N.L.R.B. 686, 687 [71 L.R.R.M. 1487]) and this administrative remedy has been specifically enforced by the federal courts. (See, e.g., *N. L. R. B.* v. *W. R. Grace Co., Const. Products, supra,* 571 F.2d 279, 283 & fn. 6.) As we have noted, the ALRB's remedial order in this case was explicitly based upon this well-established federal precedent.

---

[4] In *Transmarine,* the NLRB included in its order a provision guaranteeing the terminated employees backpay benefits equal to two weeks' wages. The ALRB did not include any minimum benefits in its remedial order; no party has challenged the ALRB's deletion of that element from its remedial order.

In light of the governing ALRA provisions, we conclude that the ALRB acted within its authority in following these federal precedents. Section 1160.3, the section of the ALRA setting forth the remedial authority of the ALRB, was modeled largely upon the language of section 10(c) of the NLRA,[5] and the Legislature plainly intended to arm the ALRB with the full range of broad remedial powers traditionally exercised by the NLRB. (See, e.g., *Virginia Electric Co.* v. *Board* (1943) 319 U.S. 533, 539-540 [87 L.Ed. 1568, 1574, 63 S.Ct. 1214].) Indeed, insofar as the language of section 1160.3 does depart from the language of the comparable federal provision, it is clear that the drafters of the ALRA intended to broaden, not diminish, the ALRB's remedial authority.[6] In light of this statutory framework, and, of course, section 1148's mandate that the ALRB "follow applicable precedents of the National Labor Relations Act," we can discern no basis for challenging the ALRB's remedial order in this case.

Contrary to Highland's contention, our court's recent decision in *J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra*, 26 Cal.3d 1 casts no doubt upon the validity of the remedial order at issue. In *Norton*, unlike the present case, we were concerned with the ALRB's imposition of a type of "make whole" remedy which the NLRB itself has

---

[5]Section 1160.3 provides in relevant part that if the ALRB finds that any person has engaged in an unfair labor practice "the board shall ... issue ... an order requiring such person to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without backpay, and making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part...."

Section 10(c) of the NLRA (29 U.S.C. § 160(c)) provides that if the NLRB finds that any person has engaged in an unfair labor practice "the Board shall ... issue ... an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without backpay, as will effectuate the policies of this subchapter...."

[6]As a comparison of the state and federal provisions reveals (see fn. 5, *ante*), the drafters of the ALRA inserted additional language, not found in the NLRA expressly authorizing the ALRB to require employers "[to] mak[e] employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain." In addition, whereas the federal act simply empowers the NLRB to require violators "to take such affirmative action including reinstatement of employees ... as will effectuate the policies of this subchapter," section 1160.3 authorizes the ALRB to require violators both "to take affirmative action" and "to provide *such other relief* as will effectuate the policies of this part." (Italics added.) Because the ALRB's remedial order in this case is clearly consistent with existing federal authority, we have no occasion to determine in what respects section 1160.3 was intended to expand the ALRB's remedial authority beyond that of the NLRB.

concluded that it has no authority to impose under the NLRA.[7] Although the drafters of the ALRA inserted specific language in section 1160.3 to make it clear that under the California act the ALRB is authorized to impose this somewhat controversial remedy (see fns. 6, 7 *ante*; Levy, *The Agricultural Labor Relations Act of 1975, supra*, 15 Santa Clara Law. 783, 802-803), the issue before us in *Norton* was simply whether the ALRB had exceeded the explicit authority afforded by section 1160.3 in concluding that this special "make whole" remedy should be applied across-the-board in all refusal-to-bargain cases, rather than on a more selective basis. In *Norton* we determined that the ALRB's across-the-board application of that particular make-whole remedy was not consistent with the legislative intent underlying the applicable language of section 1160.3, and we held that the Board was required to apply that make-whole remedy in a fashion more sensitively attuned to the fundamental purposes of the act.

In the instant case, unlike *Norton*, the ALRB imposed a remedy whose validity is well-established under the NLRA. Moreover, the remedy was not imposed by the ALRB in an across-the-board manner but rather was applied in the specific, narrow circumstances that such remedy has long been found appropriate under the applicable federal precedent. Because there is nothing in section 1160.3 or any other provision of the ALRA to suggest that the Legislature intended to withhold from the ALRB the authority to impose this type of remedial sanction which has been repeatedly invoked by the NLRB under a similar statutory scheme, we conclude that the ALRB was authorized to impose such a remedial order in this case.

---

[7]Under the "make whole" remedy at issue in *Norton*, the administrative agency attempts to determine what wages and benefits the parties would have agreed to if the employer had entered into collective bargaining with the union when it was obligated to do so. After making this determination, the agency requires the employer to pay the injured employees retroactive damages, aimed at "making the employees whole" by affording them the benefits they would have obtained but for the employer's wrongful refusal to bargain.

The NLRB has continually taken the position that because the United States Supreme Court has construed the NLRA to preclude the NLRB from requiring either party in collective bargaining to agree to a specific substantive contractual provision (see *Porter Co. v. N.L.R.B.* (1970) 397 U.S. 99 [25 L.Ed.2d 146, 90 S.Ct. 821]), the NLRB likewise lacks authority to impose a "make whole" remedy based upon its determination of what wages and other benefits the parties would probably have agreed upon. (See *Ex-Cell-o Corp.* (1970) 185 N.L.R.B. 107, revd. (D.C.Cir. 1971) 449 F.2d 1046; *Tiidee Products, Inc.* (1972) 194 N.L.R.B. 1234.) Various federal courts, however, have concluded that the Board is authorized to impose such a remedy under certain circumstances. (See, e.g., *International Union of E., R. & M. W., AFL-CIO v. N. L. R. B.* (D.C.Cir. 1970) 426 F.2d 1243, 1248-1253; *United Steelworkers of America, AFL-CIO v. N. L. R. B.* (5th Cir. 1974) 496 F.2d 1342, 1349-1352.)

4. *The Court of Appeal correctly resolved Highland's objections to the ALRB's additional unfair labor practice findings.*

As noted at the outset of this opinion, in addition to challenging the ALRB's findings and remedial order relating to its failure to bargain with the union over the effects of its decision to sell the ranch, Highland has also raised objections to a substantial number of the Board's additional unfair labor practice findings which relate, in general, to specific instances of alleged misconduct with respect to individual employees. The Court of Appeal thoroughly discussed each of these more limited issues in its comprehensive opinion in this case, and, after independently reviewing these matters, we have concluded that the Court of Appeal properly resolved each of these issues. Because these additional issues present no novel or important questions of law, we simply adopt the Court of Appeal's reasoning by reference, as we have done in similar circumstances in the past. (See *People* v. *Scott* (1978) 21 Cal.3d 284 [145 Cal.Rptr. 876, 578 P.2d 123]; *People* v. *James* (1977) 19 Cal.3d 99, 118 [137 Cal.Rptr. 447, 561 P.2d 1135].)

5. *Disposition.*

The order of the ALRB is annulled insofar as it relates (1) to the employer's promulgation of new work rules, (2) to the dismissal of Francisco Perez Navarro, and (3) to the denial of a leave of absence to Bartolo Prado Navarro. In all other respects the order of the ALRB is affirmed.

Let a decree issue enforcing the portions of the order of the Board affirmed by this decision. Each party shall bear its own costs.

Mosk, J., Newman, J., and Kaus, J.,* concurred.

**COBEY, J.*—**I concur in the majority opinion in this case, notwithstanding the well reasoned and sharply worded dissent. I do not believe that even an unambiguous statutory provision, such as Labor Code section 1153, subdivision (f), can properly be read in a vacuum.

The subdivision quite clearly makes it an unfair labor practice for an agricultural employer, such as Highland Ranch, among other things, to bargain with an uncertified union. But, as the majority opinion points

*Assigned by the Acting Chairperson of the Judicial Council.

out, the obvious purpose of this subdivision is to insure that agricultural employers do not bargain with unions that have not attained the status of exclusive bargaining representatives through a secret ballot election. Here, the union had not only decisively won such an election, but the employer had not sought administrative review of the ALRB's summary rejection of its objections to the election. The only thing remaining to be done before certification of the union was the formality of certification itself. Under these circumstances it is exalting form over substance to insist that the subdivision constitutes a bar to the imposition upon the employer of a duty to bargain in good faith with the union, notwithstanding its uncertified status.

**RICHARDSON, J.**—I respectfully dissent.

Labor Code section 1153 provides that it is an unfair labor practice for an agricultural employer either "To refuse to bargain collectively in good faith with labor organizations certified" pursuant to the relevant provisions of the code (*id.*, subd. (e)) or, alternatively, "To recognize, bargain with, or sign a collective bargaining agreement with any labor organization *not* certified" pursuant thereto. (*Id.*, subd. (f), italics added.)

In obedience to this clear statutory injunction, Highland refused to bargain with the United Farm Workers prior to its certification pursuant to the statute. The majority now holds for the first time that such refusal to commit an unfair labor practice constitutes itself an unfair labor practice because "an employer may not seize upon the absence of formal certification when it can entertain no reasonable doubt that the union which has prevailed in a representative election will in fact be certified." (*Ante*, p. 862.) Elsewhere, the majority adds the requirement that the doubt be a "good faith" one, as well as "reasonable." (*Ante*, p. 861.) Such judicial "amendment" of the statute is wholly untenable, and in my view constitutes a glaring example of judicial redrafting of the controlling statute.

Section 1153, of course, provides no such exceptions to its commands. In requiring an employer to bargain with certified unions (§ 1153, subd. (e)) and to refrain from bargaining with uncertified ones (*id.*, subd. (f)) the Legislature formulated a clear-cut directive for agricultural employers to follow in their relations with labor organizations. Such clarity, however, is scorned by the majority as somehow "literalistic." (*Ante*, p. 858.) In my view, however, "adherance to the explicit substance of"

the law (see Webster's Third New Internat. Dict. (1961) p. 1321) is both reasonable and should apply, in fairness, to the Agricultural Labor Relations Act (ALRA).

To what does the majority propose to cling instead? Initially, it is suggested that the "available legislative history" supports its construction of the statute. When statutory language is clear and unambiguous, however, we have heretofore insisted that courts should not indulge in any "construction" at all. (*Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].) Further, while the majority's references to asserted legislative history are instructive, in my opinion they undercut, rather than support, its position.

Thus, the majority notes that the proponents of the ALRA "repeatedly stressed that the act would 'only allow one way of recognition and that's through a secret ballot election. We don't allow recognitional strikes [and] we don't allow authorization cards as they do under the NLRA....'" (*Ante*, p. 859.) Having focused upon this crucial distinction between the ALRA and the NLRA, the majority then fails to take the next logical step in its analysis and inquire: How does the California law provide for that designated "one way of recognition" to be accomplished? The answer is very clear: By certification of a secret ballot election by the Agricultural Labor Relations Board. (Lab. Code, § 1156.3.) No certification, no recognition. Unsatisfied with the result of such logic, however, the majority must search for other support for its "construction." It does so, but with no greater success.

Acknowledging then that the legislative hearings surrounding adoption of the ALRA contain no actual reference to subdivision (f) of the statute (*ante*, p. 860), the majority turns to a law review article authored by a labor law consultant. The article reads: "'One new provision contained in the ALRA makes it an unfair labor practice for an employer to recognize [or] bargain with ... any labor organization not certified pursuant to the Act [citing § 1153, subd. (f)]. This section ties in with the election procedure of the Act, which specifies that the sole means by which a labor organization can achieve certification as a bargaining representative is to win a secret ballot election conducted by the board. These sections thus prohibit voluntary recognition of a labor organization by an employer based on authorization cards signed by the employees ..., a practice permitted by decisions interpreting the NLRA. The ALRA's certification procedure reflects the feeling that the best method for determining the employees' choice of a bargaining

representative is via the secret ballot election.'" (*Ante*, p. 860; Levy, *The Agricultural Labor Relations Act of 1975—La Esperanza de California Para el Futuro* (1975) 15 Santa Clara Law. 783, 789-790.)

Taken at face value, the quoted passage demonstrates the absolute necessity of *certification* of a secret ballot election as the only means of choosing a bargaining representative under the ALRA. The article's distinction between California's "certification" procedure and the alternative "authorization cards" method of achieving recognition under the federal law underscores the central role played by certification under the ALRA, but the majority either fails or refuses to recognize it. While conceding that these "indicia of legislative intent" *do* support the conclusion that subdivision (f) was designed to prevent an employer from dealing with a union that has not been selected as a bargaining representative through the ALRB's "secret election process," the majority unaccountably declares that only a *portion* of that "process" must be completed before the employer's duty to bargain arises. My colleagues assert that once a union emerges "apparently victorious" from the polling booth, then an employer not only is freed from the statute's prohibition against bargaining with an uncertified union, but indeed incurs an absolute duty to so bargain, unless it subsequently can establish that it entertained at the crucial time a "good faith, reasonable doubt as to the representative status of a union that has not yet been formally certified by the ALRB . . . ." (*Ante*, p. 861.) Otherwise, the employer acts "at its peril" in refusing to bargain with a union prior to its certification. (*Ibid.*)

Hacking with a dull blade, the majority thus chops out of the statute the clear-cut, readily understood and temporally fixed "certification" test for union recognition which lies at the heart of the ALRA. In its place the majority attempts to graft an amorphous subjective/objective test of "good faith, reasonable doubt" as to a union's representative status, substituting guess-work for certainty, while simultaneously transplanting from inapposite federal cases the notion that an employer who is subjected to the new standard fails the test "at its peril." The transplant will not take; the attempted graft should be rejected.

As Highland notes here, and as the majority cannot deny, there is no counterpart in the NLRA to subdivision (f) of section 1153 of the Labor Code. Under the federal act a union's recognition as a bargaining representative *may* come from a secret ballot election, as under California law. Unlike the California act, however, the federal law also provides for recognition upon an independent showing of support for a

union by recognitional strikes or through the signing of authorization cards by a majority of the employees involved. In such circumstances, where recognition does *not* hinge upon so precise an action as certification by an administrative board, it may make some sense to impose upon an employer a duty to construe the apparent indicia of majority support "at its peril." With due respect, however, superimposition of that additional burden upon the already well defined certification requirement of the California statute makes absolutely no sense. We should bear in mind that it is only *"applicable"* precedents of the NLRA which the ALRB is constrained to follow. (Lab. Code, § 1148, italics added.)

In addition, even under the distinctly different provisions of the NLRA it is doubtful whether an employer would have a duty to bargain with an *unrecognized* union over the effects of that employer's termination or sale of its business. None of the cases apparently cited for that very dubious proposition by the majority (*ante*, p. 857) supports it.

The Supreme Court's ruling in *Textile Workers* v. *Darlington Co.* (1965) 380 U.S. 263 [13 L.Ed.2d 827, 85 S.Ct. 994], for example, is clear: "We hold here only that when an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice." (*Id.*, at pp. 273-274 [13 L.Ed.2d at pp. 835-836].) In the instant case, the majority acknowledges that an employer has no obligation to bargain with any union *before* making such a decision. (*Ante,* p. 857.) In view of the *Textile* court's further ruling that an employer's closing of a *part* of its business "motivated by purpose to chill unionism" in its remaining plants did constitute an unfair labor practice under the federal act (380 U.S., at p. 275 [13 L.Ed.2d at p. 836]), that court had no occasion to, and did not, address the question of an employer's duty to bargain with any union concerning the effects of a decision to close or sell its business *after* that decision was made.

Three of the cases cited by the majority did examine an employer's duty to notify a union of its decision to close its plant and relocate its business so that the union could bargain on behalf of the employees it represented as to the effects of that decision. Each of them, however, involved an already *recognized* union, and not one which had yet to satisfy the requirements of the federal law to achieve that recognition. (See *N. L. R. B.* v. *Transmarine Navigation Corporation* (9th Cir.

1967) 380 F.2d 933, 934, 939 [employer had a duty to bargain with a union certified in 1960 over the effects of the employer's 1963 decision to relocate its operations]; *Cooper Thermometer Company* v. *N. L. R. B.* (2d Cir. 1967) 376 F.2d 684, 685, 687-688 [employer had a duty to bargain over the effect of its 1964 relocation decision on members of a union recognized under a 1962 contract]; *Automation Institute of L. A.* (208 N.L.R.B. No. 92, 1974) 85 L.R.R.M. 1257 [employer violated duty to bargain with union about the effects of discontinuance of operations after certification of the union].) None of these authorities imposes any duty whatever to bargain with an unrecognized union, which is the distinguishing factor in the case before us.

The final case relied upon by the majority in support of its assertion that federal law requires notification of, and bargaining with, a union while objections to that union's recognition are still pending did not involve the termination or sale of the employer's business at all. (See *N.L.R.B.* v. *W. R. Grace & Co., Const. Products* (5th Cir. 1978) 571 F.2d 279.) Instead, *Grace* was concerned with an employer's unilateral change of employment conditions—laying off four employees and changing work shifts—without advance notice to the union. (*Id.*, at pp. 282-283.) As the majority notes, federal law has long recognized that an employer has a duty to bargain over proposed changes in such working conditions pending resolution of election objections. (*Ante*, p. 856.) The reason for such a duty is to prevent the employer's unilateral and possibly irreversible implementation of work policies. The union, if ultimately recognized, should participate in such a decision because its members will be governed thereby in the future, and the union's representative status and its effectiveness in subsequent negotiations would be adversely affected. That rationale, however, has no applicability whatever to a case in which a business is sold or terminated and the employer-union relationship ceases. *Grace* neither dilutes an employer's absolute freedom to go out of business for any reason without advance notice to, or consultation with, any union, certified or not (see *Textile, supra*, 380 U.S. 263, 272-274 [13 L.Ed.2d 827, 835-836]), nor examines the issue of an employer's duty to bargain with a union after such a decision has been made.

With due respect, I think that the majority thus misstates even federal law in suggesting that under the NLRA an employer's duty to bargain over the effects of sale or termination of a business extends to an unrecognized union.

The command of Labor Code section 1153 is plain, simple, and unambiguous. An agricultural employer (1) must bargain in good faith with certified labor organizations and (2) must not bargain with non-certified ones. Our judicial obligation is equally clear. We are to read the law as it *is*, not as it might have been. At the majority's hands Highland's refusal to commit an unfair labor practice thereby becomes an unfair labor practice. In my view, the majority uses a clearly erroneous analysis to establish a plainly bad precedent, thereby turning the statute upside down. To me, it approaches the preposterous to impose a "backpay" penalty on an employer for its failure to anticipate that this court would *require* that which the Labor Code explicitly *prohibits*. There is no common sense way of interpreting Labor Code section 1153, subdivision (f), in such a manner as to convert Highland's refusal to bargain with an uncertified union into an unfair labor practice, and I would so hold.

Files, J.,* concurred.

---

*Assigned by the Acting Chairperson of the Judicial Council