[L.A. No. 31890. Aug. 1, 1985.]

HARRY CARIAN SALES, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO,
Real Party in Interest.

210

212

214

COUNSEL

Smith & Hall, David E. Smith and James W. Hall for Petitioner.

Thomas F. Olson and Carl G. Borden as Amici Curiae on behalf of Petitioner.

Manuel M. Medeiors, Daniel G. Stone, Cathy Christian, Ruth Rokeach and Nancy C. Smith for Respondent.

Dianna Lyons, Daniel A. Garcia and Wendy Sones for Real Party in Interest.

OPINION

GRODIN, J.—Employer Harry Carian Sales (HCS) seeks review of a decision of the Agricultural Labor Relations Board (ALRB or Board) finding that HCS committed 30 unfair labor practices, and ordering HCS to bargain with the United Farm Workers (UFW).

The principal issue raised in this case is whether the ALRB has authority to certify a union and issue a bargaining order as a remedy for an employ-

er's egregious unfair labor practices though the union has not won a secret ballot election. Although such bargaining orders are frequently issued by the National Labor Relations Board (NLRB), this is the first case in which the ALRB has issued such an order. We conclude that the ALRB does have the authority to issue bargaining orders and that the Board's order in this case was appropriate. As an initial matter, we also conclude that the Board's unfair labor practice findings are supported by substantial evidence, although two of the eighteen challenged findings must be set aside on other grounds. We therefore enforce the Board's order.

HCS is a table grape producer operating in Coachella Valley. In January of 1977 the UFW initiated an organizational campaign among HCS's employees. This campaign included daily visits to the fields and labor camps by union organizers, radio announcements, distribution of leaflets, weekly organizational meetings, and a highly publicized march led by UFW President Cesar Chavez.

Between March and May 1977, the UFW filed four charges with the ALRB alleging that HCS had committed a total of twenty-three unfair labor practices in violation of Agricultural Labor Relations Act (ALRA or Act) section 1153, subdivisions (a) and (c).[1] These charges were consolidated and heard by an administrative law judge (ALJ-1). In September of 1977, ALJ-1 rendered a decision finding that HCS had committed a number of the 23 unfair labor practices charged.

Meanwhile, on June 20, 1977, while ALJ-1's decision was pending, the UFW filed a certification petition and a secret ballot election was held among HCS's agricultural employees on June 27, 1977. The official tally of ballots showed 80 votes for the UFW, 88 votes for no union and 142 challenged ballots. Both the UFW and HCS filed objections to the election. In addition, the UFW filed additional unfair labor practice charges concerning incidents that allegedly occurred during the month of June. These objections and charges were consolidated and heard by a second administrative law judge (ALJ-2).

In December of 1978, ALJ-2 rendered his decision, finding that HCS had committed a number of the additional unfair labor practices alleged and

---

[1] The ALRA is codified at Labor Code section 1140 et seq. All section references are to the Labor Code unless otherwise indicated.

Section 1153 provides in pertinent part: "It shall be an unfair labor practice for an agricultural employer to do any of the following: (a) To interfere with, restrain, or coerce agricultural employees in the exercise of the rights guaranteed in Section 1152. . . . (c) By discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization."

recommending that the election be set aside. ALJ-2 also found that HCS's conduct was sufficiently egregious to preclude a fair rerun election and therefore recommended that the ALRB certify the UFW and order HCS to bargain with the union.

HCS and the UFW filed exceptions to the decision of both ALJs, and all of these exceptions were consolidated and heard by the ALRB. On October 3, 1980, the Board issued a decision affirming and modifying in part the ALJs' decisions. In all, the Board found that HCS had committed 30 unfair labor practices. These violations included surveillance of union activities; unlawful interrogation of HCS employees; threats of discharge and deportation; discriminatory hiring, layoffs and discharges; acts of violence against UFW organizers; an illegal wage increase; and election-eve promises made to HCS employees. Finding that HCS's "pervasive and outrageous conduct . . . clearly undermined the union's support, chilled the employees' union sentiment, and precluded holding a fair and free election" the Board set aside the election, certified the UFW as the employees' exclusive bargaining representative and ordered HCS to bargain with the UFW.[2]

HCS challenges the Board's findings as to 18 of the unfair labor practices charged,[3] as well as the Board's authority to issue a bargaining order as a remedy for unfair labor practices.

## I.

### *Unfair Labor Practices*

We will uphold the Board's findings concerning unfair labor practices if supported by substantial evidence on the whole record. (*Rivcom*

---

[2]Since HCS's unfair labor practices were so pervasive as to require that the election be set aside, both ALJ-2 and the Board found it unnecessary to consider the other objections to the election or to resolve the 142 challenged ballots. As the Board stated in its opinion, "Even though there remain outstanding challenged ballots, the outcome of the election is not determinative of whether a bargaining order should issue. *Case, Inc.* (1978) 237 NLRB 798 [99 L.R.R.M. 1159]. Given the large number of challenges, no useful purpose would be served by delaying the proceedings herein further to determine a final result of the election." During oral argument, HCS argued for the first time that a bargaining order is appropriate only where the union loses an election and, therefore, the Board should be required to resolve the 142 challenged ballots as a prerequisite to issuing a bargaining order. Although, generally, the Board should determine the outcome of an election before deciding on the appropriate remedy, we agree with the Board's determination that under the facts of this case, there was no point in going through the complex and very time-consuming process of resolving the 142 challenged ballots before issuing a bargaining order. Moreover, as HCS readily concedes, it could not have been prejudiced by the Board's failure to determine the outcome of the tainted election.

[3]Although in its petition to the Court of Appeal, HCS challenged the Board's finding as to a 19th unfair labor practice, HCS failed to support this challenge with any argument or discussion. We must therefore assume that the record contains substantial evidence to support the Board's finding. (See *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887 [160 Cal.Rptr. 516, 603 P.2d 881].)

*Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 757 [195 Cal.Rptr. 651, 670 P.2d 305].) "Of course, we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." (Citation omitted.) (*Rivcom, supra,* 34 Cal.3d at pp. 756-757.) Furthermore, those findings and conclusions that are within the Board's realm of expertise are entitled to special deference. (*Rivcom, supra,* 34 Cal.3d at p. 758.) And, because the evaluation of witnesses' credibility is a matter particularly for the trier of fact, the Board's findings based on the credibility of witnesses will not be disturbed unless the testimony is "incredible or inherently improbable." (*Montebello Rose Co., Inc.* v. *Agricultural Labor Relations Bd.* (1981) 119 Cal.App.3d 1, 20 [173 Cal.Rptr. 856]; *Perry Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1978) 86 Cal.App.3d 448, 463-464 [150 Cal.Rptr. 495].)

Applying these standards of review, we conclude there is substantial evidence to support the Board's findings on all of the challenged unfair labor practice charges although, as we shall explain, considerations of due process require that the findings concerning two uncharged incidents be set aside. ▮▮* We agree with the Court of Appeal's analysis of the challenged findings, and adopt the Court of Appeal's discussion as our own. The relevant portion of the Court of Appeal's opinion is set out in an appendix.

II.

*ALRB's Authority to Issue Bargaining Orders*

Any discussion of bargaining orders must begin with a discussion of the Supreme Court's decision in *NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575 [23 L.Ed.2d 547, 89 S.Ct. 1918]. The court in *Gissel* reaffirmed the NLRB's authority to issue bargaining orders as a remedy where an employer has committed "unfair labor practices which have made the holding of a fair election unlikely or which have in fact undermined a union's majority and caused an election to be set aside." (*Id.,* at p. 610 [23 L.Ed.2d at p. 576].) The court reasoned that "[i]f the Board could enter only a cease-and-desist order and direct an election or a rerun, it would in effect be rewarding the employer and allowing him 'to profit from [his] own wrongful [conduct],' while at the same time severely curtailing the employees' right freely to determine whether they desire a representative. The employer could continue to delay or disrupt the election processes and put off indefinitely his obligation to bargain; and any election held under these circum-

---

*For material contained in these headnotes, see appendix.

stances would not be likely to demonstrate the employees' true, undistorted desires." (*Id.,* at pp. 610-611 [23 L.Ed.2d at p. 576], citations and fns. omitted.)

The *Gissel* court established a tripartite categorization of unfair labor practices for determining whether a bargaining order could be issued though the union had not won an election. First, in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices, the NLRB may issue a bargaining order even without a showing that the union at one point enjoyed a card majority.[4] (*Gissel, supra,* 395 U.S. at pp. 613-614 [23 L.Ed.2d at p. 578]; see *United Dairy Farmers Coop. Assn.* v. *N.L.R.B.* (3d Cir. 1980) 633 F.2d 1054, 1066, 1069; but cf. *Conair Corp.* v. *N.L.R.B.* (D.C. Cir. 1983) 721 F.2d 1355, 1377-1384.)

Second, the NLRB may issue bargaining orders in "less extraordinary cases marked by less pervasive practices . . . [where] at one point the union had a majority . . . [and] the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." (*Gissel, supra,* 395 U.S. at pp. 614-615 [23 L.Ed.2d at p. 578].)

Finally, the *Gissel* court held, there is a "third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." (*Id.,* at p. 615 [23 L.Ed.2d at p. 578].)

The ALRA, like the NLRA, neither expressly authorizes nor expressly prohibits the issuance of "*Gissel* bargaining orders"—i.e., bargaining orders issued as a remedy for egregious employer unfair labor practices in the absence of an election won by the union. In issuing its order in this case, the ALRB relied on its general remedial authority under section 1160.3 to

---

[4]"Card majority" refers to the possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes. Under both the National Labor Relations Act (NLRA) and the ALRA, authorization cards are submitted to the labor boards by unions in support of their election petitions. In addition, under the NLRA, authorization cards are used by unions to support bargaining demands made directly to the employer. If, following a bargaining demand, the employer voluntarily recognizes the union, no election is held.

provide such "relief as will effectuate the policies of" the Act.[5] HCS argues that the general language of section 1160.3 is insufficient authority to support the Board's bargaining order. On the contrary, HCS argues, the language and legislative history of the ALRA demonstrate a legislative intent to preclude the issuance of *Gissel* bargaining orders.

HCS correctly notes that those sections of the ALRA dealing with the recognition and certification of unions (see § 1156 et seq.) refer only to secret ballot elections as the means by which a union can become the exclusive bargaining representative of a group of agricultural employees. In addition, HCS quotes extensively from hearings held by legislative committees prior to the ALRA's enactment,[6] in which the drafters of the ALRA indicated that a union could obtain recognition under the ALRA only by winning a secret ballot election. For instance, during the Senate hearings, Chief Justice Bird, then Secretary of Agriculture and Services, stated that, "under our Act, we only allow one way of recognition and that's through a secret ballot election." (Hearing before Sen. Industrial Relations Com., May 21, 1975, p. 51.) Similarly, Senator Dunlap, one of the bill's authors, stated that under the ALRA, unlike the NLRA, "there is a secret ballot [election] in all cases." (*Id.*, at p. 59.) Similar statements were made at the Assembly hearings. For instance, Assemblyman Berman, another author of the bill, commented that the ALRA "above all else, requires secret ballot elections in every instance." (Hearing before Assem. Com. on Labor Relations, May 12, 1975, p. 2.)

In addition to these comments, HCS quotes from a law review article by Professor Herman M. Levy who acted as a labor law consultant to the Agriculture and Services Agency in drafting the ALRA. In his article, Pro-

---

[5]Section 1160.3 provides, in part, that where the Board finds an unfair labor practice has been committed, it "shall issue . . . an order requiring [the transgressor] to cease and desist from such unfair labor practice, to take affirmative action, including reinstatement of employees with or without back pay, and making employees whole, when the board deems such relief appropriate, for the loss of pay resulting from the employer's refusal to bargain, and to provide such other relief as will effectuate the policies of this part."

In issuing bargaining orders, the NLRB has relied on language in section 10(c) of the NLRA [29 U.S.C. § 160(c)] identical to that relied on by the Board in this case. (See, e.g., *Frank Bros. Co.* v. *Labor Board* (1943) 321 U.S. 702, 704-705 [88 L.Ed. 1020, 1023, 64 S.Ct. 817].)

[6]Hearing before Senate Industrial Relations Committee, May 21, 1975; Hearing before Assembly Committee on Labor Relations, May 12, 1975. These hearings were recorded expressly for the purpose of establishing a record concerning legislative intent. At the May 21, 1975, hearing Senator Zenovich stated: "Well, let me say for the record that this whole hearing is being recorded as you can see. And that's for a purpose, so that there will be a record of what has transpired . . . so that if and when this bill becomes the law, people can look at the record to make some determination with respect to the legislative intent." (Hearing before Sen. Industrial Relations Com., May 21, 1975, p. 3.)

fessor Levy wrote that, under the ALRA, "The sole means by which a labor organization can achieve certification as bargaining representative is to win a secret ballot election conducted by the board." (Levy, *The Agricultural Labor Relations Act of 1975—La Esperanza De California Para El Futuro* (1975) 15 Santa Clara Law. 783, 789-790, fn. omitted.)

There seems to be no doubt that the ALRA expressly provides only one means (i.e., secret ballot elections) by which a union seeking to represent a group of workers can ordinarily obtain recognition, and that this was the intent of those who drafted the legislation. It does not necessarily follow, however, that the Legislature intended to prohibit the *Board* from issuing a bargaining order as an *extraordinary remedy* where an employer's egregious unfair labor practices have made it impossible to hold a free and fair election. On the contrary, as we shall explain, the Legislature's intent in limiting the means of union recognition was unrelated to the issue of bargaining orders and the express purpose of the Act would seem to require—rather than preclude—the Board having authority to issue bargaining orders under certain circumstances.

It is a cardinal rule of statutory construction that statutory language "must be given such interpretation as will promote rather than defeat the general purpose and policy of the law." (*People* v. *Centr-O-Mart* (1950) 34 Cal.2d 702, 704 [214 P.2d 378].) This, in turn, requires us to " 'take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " (*Cassack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 733 [114 Cal.Rptr. 460, 523 P.2d 260].)

The preamble to the ALRA states that: "In enacting this legislation the people of the State of California seek to ensure peace in the agricultural fields by guaranteeing justice for all agricultural workers and stability in labor relations. [¶] This enactment is intended to bring certainty and a sense of fair play to a presently unstable and potentially volatile condition in the state." (Stats. 1975, Third Ex. Sess., ch. 1, § 1, p. 4013.) More specifically, section 1140.2 declares that it is "the policy of the State of California to encourage and protect the right of agricultural employees to full freedom of association, self-organization, and designation of representatives of their own choosing . . . *and to be free from the interference, restraint or coercion of employers* . . . in the designation of such representatives." (Italics added.)

As the Supreme Court recognized in *Gissel,* were we to interpret the ALRA to prohibit the issuance of bargaining orders, employers would be

free to commit egregious unfair labor practices as a means of avoiding union organization, or defeating a union in an election, without fear of significant sanction. Clearly such an interpretation would defeat rather than promote the general purpose and policy of the Act. Indeed, in many cases it would make almost meaningless the agricultural employees' right to "be free from the interference, restraint or coercion of employers . . . in the designation of [their] representatives." (§ 1140.2.)

■■■ The fact that the Legislature restricted the means by which a union could seek recognition does not require us to adopt an interpretation so at odds with the purpose of the Act. In its decision in the instant case, the ALRB noted that the Legislature, in requiring secret elections, was not concerned with the propriety of bargaining orders. Rather, the "evil" sought to be remedied by the Legislature was the voluntary recognition of unions by employers, especially so-called "sweetheart" deals between employers and unions who lacked the support of the employees. ■■■ This interpretation by the Board, "drawing upon its familiarity with the history of the ALRA and the 'general understanding of the times' " must be given great weight. (*Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859 [176 Cal.Rptr. 753, 633 P.2d 949].) Moreover, the Board's interpretation is fully supported by the historical context of the Act and by the very comments quoted by HCS.

Prior to the ALRA's enactment, the voluntary recognition of unions by agricultural employers, often without even consulting the employees, had become a major problem. This is graphically illustrated by the facts presented in *Englund* v. *Chavez* (1972) 8 Cal.3d 572 [105 Cal.Rptr. 521, 504 P.2d 457]. In *Englund,* an association of 27 growers in the Salinas Valley approached the Teamsters union to "feel out" the prospects of negotiating a bargaining agreement. The following day all 27 growers signed recognition agreements with the union and, within a week, all had executed 5-year exclusive "union shop" agreements. Neither the Teamsters nor the employers had informed or consulted the employees, upon whose behalf the agreements were purportedly signed. In fact, as the court noted, a substantial number of the workers, probably a majority, actually favored the UFW over the Teamsters. (*Id.,* at p. 579.) The court characterized the employers' conduct as "the ultimate form of favoritism, completely substituting the employer's choice of unions for his employees' desires." (*Id.,* at p. 591.) As a direct result of this sort of voluntary recognition by employers throughout California, a bitter struggle ensued between the UFW and the Teamsters that was "disorderly, occasionally bloody, and never the showplace of self-determination." (Segur & Fuller, *California's Farm Labor Relations: An Analysis of the Initial Results* (1976) 99 Monthly Lab. Rev. 25, 26; see also

Comment, *California's Attempt to End Farmworker Voicelessness: A Survey of the Agricultural Labor Relations Act of 1975* (1976) 7 Pacific L.J. 197, 206-211.)[7]

In *Highland Ranch, supra,* 29 Cal.3d at page 858, we quoted with approval the Board's observation in an earlier case (*Kaplan's Fruit & Produce Co., Inc.* (1977) 3 ALRB No. 28, p. 7), that the facts in *Englund* v. *Chavez, supra,* 8 Cal.3d 572, were an integral part of the history leading to the enactment of the ALRA, and we affirmed the Board's conclusion that section 1153, subdivision (f) (making it an unfair labor practice for an employer to bargain with a union that has not won a secret election) "was adopted for the purpose of prohibiting an employer from entering into a 'sweetheart' arrangement with one of two or more competing unions." (*Highland Ranch, supra,* 29 Cal.3d at pp. 859-860.) It was against this background of voluntary recognition and "sweetheart" deals that the ALRA was enacted.

The comments of those who drafted the ALRA, quoted by HCS, are perfectly consistent with the Board's conclusion that the secret ballot provisions were intended to preclude voluntary recognition, not bargaining orders. When considered in context, it is clear that all of the comments were made in reference to the importance of having worker-initiated secret elections *as opposed to* various means of voluntary recognition that had been abused by employers (and unions) in the past.

For instance, Assemblyman Berman stated: "Now, A.B. 1533 is a measure which, above all else, requires secret ballot elections in every instance. The primary theme of this bill is self-determination by the workers. Recognition cannot be obtained by recognitional strikes; it cannot be obtained by pressures on the growers through the secondary boycott; it cannot be obtained by sweetheart contracts." (Hearing before Assem. Com. on Labor Relations, *supra,* at p. 2.)

Similarly, in response to a question concerning why employers are not given the right to call an election under the ALRA, as they are under the NLRA, Secretary Bird stated: "Now, under our Act, we only allow one way of recognition and that's through a secret ballot election. We don't allow recognitional strikes, we don't allow authorization cards as they do under the NLRA, and it was a strong feeling after due deliberation on this issue that if you were going to bring some kind of resolution on the question

---

[7]It has been suggested that this struggle was the "unstable and potentially volatile condition" referred to in the Act's preamble. (Segur & Fuller, *supra,* at p. 26.)

of legitimacy, that if you allowed the employer to trigger the election mechanism, there would always be raised the question of whether or not he coerced the employees and forced an election upon employees in some way." (Hearing before Sen. Industrial Relations Com., *supra,* at p. 51.)

Similarly, in the sentence immediately following that quoted by HCS (*ante,* at p. 223), Professor Levy concluded that the secret election provisions of the Act "thus prohibit voluntary recognition of a labor organization by an employer. . . ." (Levy, *supra,* at p. 789.)[8]

It appears from these comments and from the historical context of the Act that the Legislature provided for secret ballot elections, but precluded other means of recognition that had historically been abused by employers, because it felt this scheme would best ensure worker self-determination—the underlying purpose of the Act. There is nothing inconsistent between this intent to prevent coercion by employers, and the Board having authority to issue bargaining orders in extraordinary cases where an employer's extreme and coercive tactics preclude the employees from expressing their choice in a free election. Indeed, as already discussed, a bargaining order may be the only way of ensuring worker self-determination under such circumstances.[9]

HCS next contends that the high court's decision in *Gissel* was based on NLRA section 9(a) [29 U.S.C. § 159(a)] which implicitly allows for certi-

---

[8]Perhaps more significant is another of Professor Levy's statements, not quoted by HCS. HCS cites Professor Levy's comments in support of its argument that the drafters of the ALRA clearly intended to preclude bargaining orders. Yet in the same article, Professor Levy wrote the following: "Under the NLRA . . . a union may secure the right to bargain with the employer even though it has never won a secret-ballot election, if the employer's unfair labor practices have made the holding of a fair election improbable. In these circumstances, the NLRB would adhere to the decision in *NLRB* v. *Gissel Packing Co.* and order the employer to bargain with the union even though there had been no election. Query whether the ALRB, faced with a similar situation, would consider this NLRB decision an 'applicable precedent' in view of the fact that the ALRA is committed to awarding bargaining status only through the election process." (Levy, *supra,* at p. 788, fns. omitted.) At the very least this passage suggests that Professor Levy believed the propriety of bargaining orders was a question left open by the ALRA and one to be determined by the Board. (The issue of whether *Gissel* is "applicable precedent" is discussed, *post,* at p. 227.)

[9]Because of certain constraints on the holding of elections, bargaining orders may be even more important under the ALRA than under the NLRA. As the Board noted in its decision in this case: "Under the provisions of the ALRA, elections must be held within seven days of the filing of a representation petition. Section 1156.3(a). The petition may only be filed when the employer's payroll reflects 50 percent of the peak agricultural employment for the current calendar year. Section 1156.4. These statutory prerequisites, not present in the NLRA, make a rerun election less feasible. Even after waiting for the effects of unlawful conduct to subside, a labor organization may have to wait as long as another full year to file a new petition. Such delays, where caused initially by an employer's illegal interference, would further conflict with the effectuation of the goals of the Act."

fication by means other than secret ballot elections. ■■ ■ ■ ■ Since certification under the ALRA is limited to secret elections, HCS argues, *Gissel* is not "applicable precedent."[10] HCS misconstrues the holding in *Gissel*.

In three of the cases consolidated in *Gissel*, the union had obtained authorization cards from a majority of employees and, on the basis of the cards, demanded recognition by the employers. All three employers refused to bargain with the union. The NLRB held that the employers' refusal to bargain violated NLRA section 8(a)(5)[11] and that this violation, in conjunction with other unfair labor practices committed by the employers, justified a bargaining order.

In all three cases the Fourth Circuit reversed the Board's findings of section 8(a)(5) violations on the grounds that an employer's duty to bargain arose only after the union won a secret ballot election. Since the employers had no duty to bargain based solely on authorization cards, the Fourth Circuit reasoned, there were no section 8(a)(5) violations and bargaining orders were unwarranted.

Thus, the Supreme Court in *Gissel* was faced with two independent questions: whether an employer's duty to bargain under NLRA section 8(a)(5) can arise without a Board election and, if so, whether a bargaining order is an appropriate remedy where an employer rejects a card majority and refuses to bargain while at the same time committing unfair labor practices that tend to undermine the union's majority and make a fair election an unlikely possibility (395 U.S. at p. 579 [23 L.Ed.2d at p. 558]). It was in answering the first question that the court discussed NLRA section 9(a) and held that because section 9(a) allows for recognition by means other than secret ballot election, an employer's duty to bargain under section 8(a)(5) could arise even in the absence of a Board election. (*Id.*, at pp. 595-600

---

[10]Section 1148 provides that, "The board shall follow applicable precedents of the National Labor Relations Act, as amended." It should be noted that section 1148 requires only that the ALRB follow applicable NLRA precedent; it does not require that the Board make only such orders or decisions which have precedent under the NLRA. Thus, even if *Gissel* was not strictly "applicable," if the Board otherwise had authority to issue *Gissel*-type bargaining orders, it could do so if it believed such orders were necessary to effectuate the policies of the ALRA.

[11]NLRA section 8(a)(5) [29 U.S.C. § 158(a)(5)] provides that: "It shall be an unfair labor practice for an employer . . . . (5) to refuse to bargain collectively with the representative of his employees, subject to the provision of section 159(a) [§ 9(a)] of this title."

Section 9(a) provides, in part: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purpose, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining. . . ."

[23 L.Ed.2d at pp. 567-570].) Having so held, the court went on to address the second question—whether a bargaining order was an appropriate remedy. In upholding the Board's authority to issue bargaining orders, the court did not in any way rely on its earlier discussion of section 9(a) or its conclusion that a union could obtain recognition under the NLRA by means other than a secret election. (*Id.*, at pp. 610-616 [23 L.Ed.2d at pp. 576-579].) *Gissel* is therefore not rendered inapplicable by the fact that, unlike under the ALRA, a union ordinarily may obtain recognition under the NLRA even in the absence of a secret election.[12]

Nor is *Gissel* rendered inapplicable by virtue of the fact that each of the cases consolidated in *Gissel* involved an unlawful refusal to bargain (i.e., a violation of NLRA § 8(a)(5)), whereas, in the instant case, there was no unlawful refusal to bargain. The *Gissel* court itself expressly approved the Board's long standing policy of issuing bargaining orders, under certain circumstances, "in the absence of a § 8(a)(5) violation or even a bargaining demand" (*Gissel, supra,* at p. 614 [23 L.Ed.2d at p. 578]), and there is considerable pre- and post-*Gissel* precedent for issuing bargaining orders to remedy violations of NLRA sections 8(a)(1) and (3) (which are identical, in pertinent part, to ALRA § 1153, subds. (a) and (c)) in the absence of any duty to bargain under section 8(a)(5). (See, e.g., *N. L. R. B.* v. *Bighorn Beverage* (9th Cir. 1980) 614 F.2d 1238, 1243; *N. L. R. B.* v. *Production Plating Co.* (6th Cir. 1980) 614 F.2d 1117; *Appletree Chevrolet, Inc.* (1980) 251 NLRB 666 [105 L.R.R.M. 1220]; *Coating Products, Inc.* (1980) 251 NLRB 1271 [105 L.R.R.M. 1399, 1400]; *Drug Package, Inc.* v. *N. L. R. B.* (8th Cir. 1978) 570 F.2d 1340, 1345; *J.C. Penny Co.* v. *N. L. R. B.* (10th Cir. 1967) 384 F.2d 479, 486; *United Steelworkers of America* v. *N. L. R. B.* (D.C. Cir. 1967) 376 F.2d 770, 772; *N. L. R. B.* v. *Delight Bakery, Inc.* (6th Cir. 1965) 353 F.2d 344, 346-347; *Piasecki Aircraft Corp.* v. *N. L. R. B.* (3d Cir. 1960) 280 F.2d 575, 591-592.)

HCS makes four additional arguments to support its contention that bargaining orders are precluded under the ALRA. None of these arguments is persuasive.

---

[12]Significantly, several years after its decision in *Gissel,* the Supreme Court held that an employer has no duty to bargain simply because the union presents it with a majority of authorization cards. Rather, the Supreme Court held, the union must "tak[e] the next step in invoking the Board's election procedure." (*Linden Lumber Division* v. *N.L.R.B.* (1974) 419 U.S. 301, 310 [42 L.Ed.2d 465, 472, 95 S.Ct. 429].) Thus, since 1974, the primary means of establishing a duty to bargain and obtaining recognition under the NLRA has, in practice, been the same as that under the ALRA—i.e., secret election (although under the NLRA an employer is still free to voluntarily recognize a union based on authorization cards). The fact that the NLRB has, nonetheless, continued to issue bargaining orders on a regular basis adds support to the argument that bargaining orders are not inappropriate under the ALRA simply because an election is the sole means of obtaining recognition.

First, HCS argues that since it is an unfair labor practice only for an employer to refuse to bargain with a union that has won a secret election (§ 1153, subd. (e)), it would not be an unfair labor practice for an employer to refuse to bargain following a *Gissel* bargaining order. Since the Board's remedial authority applies only to unfair labor practices (§ 1160.3), HCS argues, the Board is without authority to enforce a bargaining order where the union has not won an election. HCS concludes that the Legislature could not have intended to authorize bargaining orders yet provide no remedy if the employer refused to comply with the order.

This argument is without merit. ■■■ Although the Board's remedial authority is restricted to unfair labor practices, the Board's bargaining order in this case was issued expressly to remedy the 30 unfair labor practices it found HCS had committed. The Board can therefore seek court enforcement of its order under section 1160.8[13] whether or not the employer's failure to comply with the order would, itself, constitute an independent unfair labor practice.

Second, relying on its contention that the holding in *Gissel* was based on the fact that the NLRA does not limit the means of obtaining union recognition to secret elections, HCS argues that had the Legislature intended to allow *Gissel* bargaining orders despite the fact that the ALRA *does* limit the means of obtaining recognition, it would have expressly authorized such orders. As we have already discussed, this was *not* the basis of the holding in *Gissel*. HCS' argument is therefore without merit.

■■■ Next, noting that the ALRA *expressly* authorizes a make-whole remedy (§ 1160.3), HCS argues that had the Legislature intended to authorize bargaining orders it would have been similarly explicit. HCS' reliance on the provision for a make-whole remedy is misplaced. Section 1148 mandates that the ALRB follow applicable precedent of the NLRA. The Legislature expressly authorized the make-whole remedy because this remedy

---

[13]Section 1160.8 provides, in part: "Any person aggrieved by the final order of the board granting or denying in whole or in part the relief sought may obtain a review of such order in the court of appeal. . . . [¶] If the time for review of the board order has lapsed, and the person has not voluntarily complied with the board's order, the board may apply to the superior court . . . for enforcement of its order. If after hearing, the court determines that the order was issued pursuant to procedures established by the board and that the person refuses to comply with the order, the court shall enforce such order by writ of injunction or other proper process. The court shall not review the merits of the order."

"Final order," under section 1160.8, "means solely an order of the board either dismissing a complaint in whole or in part or directing a remedy for the unfair labor practices found." (*United Farm Workers* v. *Agricultural Labor Relations Board* (1977) 74 Cal.App.3d 347, 349 [141 Cal.Rptr. 347]; see also *Belridge Farms* v. *Agricultural Labor Relations Bd.* (1978) 21 Cal.3d 551, 556 [147 Cal.Rptr. 165, 580 P.2d 665].)

was not clearly established NLRA precedent and therefore was not automatically incorporated through section 1148. As Secretary Bird explained: "[T]his language [concerning the make-whole remedy] was just placed in because there has been a good deal of discussion with the National Labor Relations Act that it ought to be amended to allow the 'make whole' remedy, and this is something that the people who have looked at this Act carefully believe is a progressive step and should be taken. And we decided since we were starting anew here in California, that we would take that progressive step." (Hearing before Sen. Industrial Relations Com., *supra,* at pp. 64-65.) Because bargaining orders were well-established precedent at the time the ALRA was enacted, there was no similar need to make their authorization explicit.

Finally, HCS notes that in 1979 the Legislature failed to enact Assembly Bill No. 840—an amendment to the ALRA that, among other things, would have expressly authorized the Board to issue bargaining orders.[14] HCS argues that the Legislature's failure to enact Assembly Bill No. 840 demonstrates both an absence of such authorization in the ALRA and a "reaffirmation" that bargaining orders should not be permitted. Of course, contrary to HCS's contention, the Legislature's failure to enact the amendment in 1979 demonstrates nothing about what the Legislature intended in 1975. At most it might arguably reflect an intent on the part of the Legislature in 1979 that bargaining orders not be permitted.

As a general matter, the inferences that can be drawn merely from the Legislature's failure to enact a bill are quite limited. As this court has warned, "At best, 'Legislative silence is a Delphic divination.'" (Citation omitted.) (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 418 [128 Cal.Rptr. 183, 546 P.2d 687].) For a number of reasons, the Legislature's failure to enact Assembly Bill No. 840 does not justify an inference that the Legislature thereby intended to preclude bargaining orders.

First, the circumstances surrounding the demise of Assembly Bill No. 840 were rather pedestrian and unrevealing. The legislative history shows

---

[14]Assembly Bill No. 840 would have amended section 1160.3 to read, in pertinent part: "The board may provide such other relief as will effectuate the policies of this part. Such relief may include the issuance of an order requiring an employer to bargain in good faith with a labor organization provided that such labor organization has filed a petition or authorization cards signed by a majority of the currently employed employees in the bargaining unit pursuant to subdivision (a) of Section 1156.3 or subdivision (d) of Section 1156.7 and the board determines that the unfair labor practices that an employer has committed during the election process are so outrageous and pervasive in nature that their coercive effects cannot be eliminated by the application of traditional remedies with the result that a fair and reliable election cannot be conducted."

that the bill was read for the first time on March 12, 1979, and referred to the Committee on Labor, Employment and Consumer Affairs where it was held without recommendation until January 30, 1980, at which time it was filed with the chief clerk "pursuant to Joint Rule 56," and "died pursuant to Art. IV, sec. 10(a) of the Constitution."[15]

Second, there was another major provision in the amendment, unrelated to bargaining orders, that might have been responsible for the Legislature's failure to enact Assembly Bill No. 840. This other provision declared make-whole relief inappropriate where the employer refuses to bargain in order to seek judicial review of the certification of an election by the Board.[16]

Finally, the Legislature may well have felt that Assembly Bill No. 840 was unnecessary since section 1148 requires the Board to follow applicable NLRA precedent and bargaining orders were already well-established precedent under the NLRA.

Under these circumstances, we cannot infer from the Legislature's failure to enact Assembly Bill No. 840 that the Legislature intended to prohibit bargaining orders.

Where an employer forecloses the possibility of holding a free and fair election by committing egregious unfair labor practices, a bargaining order may be the only way to ensure worker self-determination, "free from the interference, restraint and coercion of employers" (§ 1140.2). Were we to construe the ALRA's mandate for secret ballot elections to prohibit the Board from issuing remedial bargaining orders we would, in essence, be transforming the workers' most effective shield into the employers' most formidable sword. We find nothing in the language or legislative history of the Act to compel such a construction. ■ We therefore hold that the ALRB has authority to issue remedial bargaining orders in appropriate cases. We turn now to the question whether a bargaining order was an appropriate remedy in this case.

---

[15]Joint Rule 56 provides for filing with the chief clerk bills not passed by January 30.

Article IV, section 10, subdivision (a) of the Constitution provides in part: "Any bill introduced during the first year of the biennium of the legislative session that has not been passed by the house of origin by the thirtieth day of January of the second calendar year of the biennium may no longer be acted upon by the house."

[16]Ironically, under HCS's argument, failure to enact this provision demonstrates the Legislature's belief that the statute did not already contain such a limitation and that no such limitation should be added. Yet in *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 31-35 [160 Cal.Rptr. 710, 603 P.2d 1306], this court, without benefit of Assembly Bill No. 840, concluded that make-whole relief was not appropriate under such circumstances.

## III.

### *Appropriateness of Bargaining Order in This Case*

 In fashioning its remedies, "the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." (*Gissel, supra,* at p. 612, fn. 32 [23 L.Ed.2d at p. 577].) A reviewing court will reverse the Board's choice of remedy only if it amounts to an abuse of discretion. (*Butte View Farms* v. *Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 967 [157 Cal.Rptr. 476].)[17]

In issuing the bargaining order in this case, the ALRB held that HCS's unfair labor practices were so outrageous and pervasive that they fell within the first category of cases described by the *Gissel* court (see, *ante,* at p. 221), thus making a bargaining order appropriate even in the absence of a card majority. It is unclear, however, whether the Board relied on this finding in issuing its bargaining order. After summarizing HCS's 30 unfair labor practices the Board held: "We affirm the ALJ's conclusion that a majority of the employees in the bargaining unit had signed cards authorizing the UFW to represent them prior to the election. We therefore rely on these cards to establish that a majority of the employees had indicated their support for the UFW, and implement a bargaining order to return events to the status quo prior to the unfair labor practices." Because we conclude that the bargaining order issued in this case was appropriate under the second *Gissel* category, we need not decide whether it could also be sustained on the basis of the first *Gissel* category.

In order to support a "second category" bargaining order, the Board must find that "the possibility of erasing the effects of past [unfair labor] practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that the employee sentiment *once*

---

[17]A bargaining order is an extraordinary remedy that should be granted only in exceptional cases. Notwithstanding the deference given to the Board's choice of remedy, appellate courts have a responsibility to ensure that bargaining orders are issued only in appropriate cases. To enable reviewing courts to meet this responsibility, and to ensure consistent application of the remedy, the Board should clearly articulate the reasons behind its decision to issue a bargaining order in a particular case. Specifically, the Board should make a detailed analysis, including specific findings, concerning the immediate and residual impact of the unfair labor practices on the election process; the likelihood of recurring misconduct; and the potential effectiveness of ordinary remedies. In addition, the Board should distinguish factually similar cases in which bargaining orders were not issued. (See, e.g., *N.L.R.B.* v. *Century Moving & Storage, Inc.* (7th Cir. 1982) 683 F.2d 1087, 1093; *N.L.R.B.* v. *Gibralter Industries Inc.* (6th Cir. 1981) 653 F.2d 1091, 1099; see also Note, *Gissel Bargaining Orders: Circuit Courts Struggle to Limit NLRB Abuse* (1983) 40 Wash. & Lee L.Rev. 1661.)

*expressed through cards* would, on balance, be better protected by a bargaining order." (*Gissel, supra,* at pp. 614-615 [23 L.Ed.2d at p. 578], italics added.) HCS makes a number of challenges to the authorization cards relied on by the Board in holding that a bargaining order was justified under the second category of *Gissel.*

First, HCS argues that the authorization cards signed by a majority of HCS employees were improperly admitted into evidence before the ALJ. The general counsel's complaint did not allege that the UFW had obtained a card majority, nor did it specifically request a bargaining order remedy. When the UFW moved to amend the complaint (apparently to include a bargaining order request) the general counsel, as well as HCS, objected to the amendment and to the introduction of any evidence—including authorization cards—relating to the propriety of a bargaining order.[18] The ALJ denied the UFW's motion to amend the complaint and refused to admit evidence of majority status on the grounds that, since there were no allegations in the complaint concerning majority status, such evidence was "immaterial and irrelevant." The UFW sent a mail-o-gram to the ALRB requesting immediate review of the ALJ's decision and the Board, while upholding the denial of the UFW's motion to amend the complaint, apparently instructed the ALJ to admit evidence relating to majority support. HCS argues that the authorization cards were immaterial and irrelevant and therefore should not have been admitted.

Although the general counsel's complaint did not specifically request a bargaining order, the prayer for relief did include a request that the Board provide "such other and further relief as will effectuate the purposes of the Act." ▮ The Board has broad discretion in choosing the most appropriate remedy and there is nothing in the ALRA or the regulations to suggest that the Board may grant only those remedies specifically requested in the prayer for relief. Thus, evidence concerning any remedy potentially appropriate on the facts alleged in the complaint is material and relevant. Evidence of a card majority is clearly both material and relevant to the propriety of a bargaining order and therefore the authorization cards were properly admitted into evidence.[19]

---

[18]The general counsel stated on the record that he had conferred with his own staff and with the regional counsel and all agreed that the facts of this case did not warrant a request for a bargaining order.

[19]In the course of its argument concerning the admissibility of the cards, HCS simply asserts that it was "not afforded constitutional due process by being appraised [*sic*] in a complaint issued by General Counsel that it was alleged its conduct so interfered with the election process that no fair election could be held, and that a bargaining order remedy would be appropriate." It is not clear whether HCS is arguing that it lacked notice of the

HCS next argues that, even if the cards were relevant, the Board "violated and abrogated" the general counsel's final authority under section 1149[20] by ordering the ALJ to admit the cards into evidence over the general counsel's objections. While the general counsel does have final authority with respect to the investigation and prosecution of unfair labor practice charges, it is the Board's responsibility to decide the merits of the case and to fashion an appropriate remedy. Obviously, the Board cannot determine the appropriate remedy if it is denied information critical to make that determination. In this case, the Board's order to the ALJ simply required the admission of evidence necessary to consider, and possibly fashion, a remedy for the unfair labor practice charges which the general counsel had alleged in its complaint. This order therefore did not unduly infringe upon the general counsel's sphere of authority.

HCS next argues that, even if the authorization cards were properly admitted, they are not reliable indicators of majority support in this case. In affirming the ALJ's conclusion that a majority of employees had signed authorization cards and that the cards "establish that a majority of the employees had indicated their support for the UFW," the Board relied to some extent on *N.L.R.B.* v. *Cumberland Shoe Corp.* (1963) 144 NLRB 1268 [54 L.R.R.M. 1233], enforced (6th Cir. 1965) 351 F.2d 917. Under the *Cumberland Shoe* doctrine, "if the card itself is unambiguous (*i.e.*, states on its face that the signer authorizes the Union to represent the employee for collective bargaining purposes and not to seek an election), it will be counted unless it is proved that the employee was told that the card was to be used *solely* for the purpose of obtaining an election." (*Gissel, supra*, at

---

bargaining order itself, or that because it did not have notice a bargaining order might be issued it lacked adequate notice that the validity of the authorization cards was going to be litigated. Either way, HCS' due process argument lacks merit.

It is arguable that, upon receiving the complaint, HCS had constructive notice a bargaining order might be sought because the complaint alleged unfair labor practices egregious enough to warrant a bargaining order and the prayer for relief requested all appropriate remedies. In any event, HCS was put on actual notice no later than March 15, 1978, that the UFW would be seeking a bargaining order. A week later, on March 22, the ALJ informed the parties that the ALRB had ordered the admission of evidence concerning the UFW's majority support. Since HCS argued there, as it does here, that evidence of majority support was relevant only to the propriety of a bargaining order, HCS was sufficiently apprised that the Board was considering issuing a bargaining order. It was almost a week later before the UFW began presenting evidence of majority support and HCS vigorously litigated the validity of the cards at the hearing before the ALJ. HCS also had full opportunity to challenge both the validity of the cards and the propriety of the bargaining order in its exceptions to the ALJ's decision. Under these circumstances, HCS was not denied due process.

[20]Section 1149 provides, in part, that the general counsel "shall have final authority, on behalf of the board, with respect to the investigation of charges and issuance of complaints under Chapter 6 (commencing with Section 1160) of this part, and with respect to the prosecution of such complaints before the board."

p. 584 [23 L.Ed.2d at p. 561].)[21] Thus, even if employees are told that the purpose of the cards is to obtain an election, the cards will be valid so long as the employees are not told that this is the *sole* purpose of the cards. (*Cumberland Shoe, supra,* 351 F.2d at p. 920.)

It is undisputed that the cards in this case clearly and unambiguously stated (in English and Spanish) that employees who signed the card authorized the UFW to represent them for collective bargaining purposes. HCS nonetheless argues that the cards do not pass the *Cumberland Shoe* test.

First, HCS argues that the testimony of UFW organizers reveals that, in speaking with employees, each of them emphasized the need to have a majority of cards in order to secure an election. HCS also notes the testimony of six HCS employees that organizers told them the cards would be used to obtain an election and that the workers would receive certain benefits *if* the union won the election.[22]

As already discussed, even if organizers told HCS employees only that the cards would be used for an election, the cards would still be valid under the *Cumberland Shoe* doctrine as long as the employees were not told that the cards would be used *solely* for the purpose of obtaining an election.[23] Furthermore, there was testimony that union organizers did not tell HCS employees only that the cards would be used for an election but, in addition, emphasized that the cards indicated support for the UFW and authorized the union to represent them; discussed the benefits that would accrue to workers if the UFW was their representative; and asked workers to read the cards before signing them or in some cases, read the cards to the workers.

---

[21]In approving the *Cumberland Shoe* doctrine, the *Gissel* court stated: "[E]mployees should be bound by the clear language of what they sign unless that language is deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." (395 U.S. at p. 606 [23 L.Ed.2d at p. 574].)

[22]All six employees were still employed by HCS at the time of their testimony. The court in *Gissel* noted that such testimony of current employees is inherently suspect in that "employees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity. . . ." (395 U.S. at p. 608 [23 L.Ed.2d at p. 575].)

[23]The Supreme Court in *Gissel* affirmed the trial examiner's holding that the authorization cards were valid under the *Cumberland Shoe* doctrine even though employees had been told one or more of the following: "(1) that the card would be used to get an election (2) that he had the right to vote either way, even though he signed the card (3) that the card would be kept secret and not shown to anybody except to the Board in order to get an election." (*Id.,* at pp. 584-585, fn. 5 [23 L.Ed.2d at p. 561].)

HCS makes a second argument which is a bit more troubling. In warning against too mechanical an application of the *Cumberland Shoe* doctrine, the *Gissel* court quoted with approval the following statement by the NLRB in *Levi Straus & Co.* (1968) 172 NLRB 732 [68 L.R.R.M. 1338]: " 'The foregoing does not of course imply that a finding of misrepresentation [in the solicitation of cards] is confined to situations where employees are expressly told in *haec verba* that the "sole" or "only" purpose of the cards is to obtain an election. The Board has never suggested such a mechanistic application of the foregoing principles, as some have contended. The Board looks to substance rather than to form. It is not the use or nonuse of certain key or "magic" words that is controlling, but whether or not the totality of circumstances surrounding the card solicitation is such, as to add up to an assurance to the card signer that his card will be used for no purpose other than to help get an election.' " (*Gissel, supra,* at p. 608, fn. 27 [23 L.Ed.2d at p. 575].)

HCS argues that a consideration of the "totality of circumstances surrounding the card solicitation" in this case, reveals that employees who signed the cards knew that the cards would be used for the sole purpose of obtaining an election. In particular, HCS notes that at the time of its enactment the ALRA was represented to legislators, the public and, most importantly, agricultural workers, as allowing union recognition only through secret ballot elections. This has been reinforced by the fact that, in practice, unions have been certified under the ALRA only after winning an election. HCS argues that, in addition, the literature and comments of UFW organizers gave HCS employees the clear impression that workers would obtain the benefits of union representation only if the UFW won an election.

There is some merit to HCS's argument. If employees believed that by signing the cards they were, in effect, "voting" only for an election and not necessarily for the union, it is arguable that their signatures do not necessarily represent a strong commitment to or support for the union. On the other hand, in the bargaining order context, "we need only decide whether the cards are *reliable enough* to support a bargaining order where a fair election probably could not have been held, or where an election that has been held was in fact set aside." (*Gissel, supra,* at p. 601, fn. 18 [23 L.Ed.2d at p. 571], italics added.) There is substantial evidence in the record that UFW organizers, in speaking with HCS employees, encouraged them to read the cards and emphasized the benefits of union representation. Except for the testimony of one current HCS employee, there is no evidence that union organizers urged workers to sign cards regardless of their feelings about the union, or simply to support the democratic process. (See, e.g.,

*Cumberland Shoe, supra,* 351 F.2d at p. 920.)[24] Under these circumstances, we believe the authorization cards obtained by the UFW are "reliable enough" to support the Board's bargaining order.

Even if the authorization cards are considered reliable, however, a second category bargaining order is justified only if the Board finds that "the possibility of erasing the effects of past [unfair labor] practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight. . . ." (*Gissel, supra,* at p. 614 [23 L.Ed.2d at p. 578].) HCS argues that a bargaining order is not appropriate in this case because traditional remedies *are* sufficient. HCS relies primarily on its contention that sufficient time has passed since the alleged unfair labor practices,[25] and worker turnover has been so extensive that the "taint" has been dissipated and a fair rerun election could now be held. The Board takes the position that, in determining whether to issue a bargaining order, it need not consider events occurring subsequent to the employer's unfair labor practices.

There is a great deal of confusion under the NLRA whether "subsequent events," such as the passage of time and employee turnover, should be considered by the NLRB and/or reviewing courts in deciding the appropriateness of a bargaining order. (See Comment, *"After All, Tomorrow is Another Day": Should Subsequent Events Affect the Validity of Bargaining Orders?* (1979) 31 Stan.L.Rev. 505, 512-521, and cases cited therein.) Much of this confusion stems from a failure of the circuit courts, in particular, to make clear which "subsequent events" are at issue in a given case: those occurring between the unfair labor practices and the Board's order; those occurring between the Board's order and the reviewing court's decision; or both.

We think it clear that in reviewing the propriety of a bargaining order issued by the Board, appellate courts should not consider events that occur subsequent to the Board's bargaining order. As the Ninth Circuit

---

[24]Bertilia Calderon testified that, after informing a UFW organizer that she would not sign an authorization card because she "did not want to be committed to anything," the organizer assured her that, "You go ahead and sign it. You will not be committed to anything." Another HCS employee testified that he was told he would be free to vote as he desired if the union secured an election. There is no evidence, however, to suggest that he was told this in order, or in such a manner as to encourage him to sign the card notwithstanding reservations he might have about union representation. The Supreme Court in *Gissel* acknowledged that an authorization card is not invalid merely because an employee is told that he would have " 'the right to vote either way, even though he signed the card.' " (*Gissel, supra,* at pp. 584-585, fn. 5 [23 L.Ed.2d at p. 561].)

[25]The Board's order was issued more than three years after the alleged unfair labor practices and it has now been over seven years since the unfair labor practices were committed.

stated in *N.L.R.B.* v. *L. B. Foster Company* (9th Cir. 1969) 418 F.2d 1: "[Delay] is an unfortunate but inevitable result of the process of hearing, decision and review prescribed in the Act. And to deny enforcement, with or without remand for reconsideration on the basis of facts occurring after the Board's decision, is to put a premium upon continued litigation by the employer; it can hope that the resulting delay will produce a new set of facts, as to which the Board must then readjudicate. Suppose that the Board does so, and again finds against the employer. There can then be a petition to this court, a decision by it, and a petition for certiorari to the Supreme Court. By that time there will almost surely be another new set of facts. When is the process to stop?" (*Id.,* at p. 4.)

The employer in *Foster* specifically urged, as does HCS, that rapid turnover in its workforce eliminated the necessity of a bargaining order. In *Foster,* the Ninth Circuit answered: "Emphasis is given to the rapid turnover in the employer's personnel as a reason for not enforcing the order. But we think that this is a reason to enforce. Otherwise there will be an added inducement to the employer to indulge in unfair practices in order to defeat the union in an election. He will have as an ally, in addition to the attrition of union support inevitably springing from delay in accomplishing results, the fact that turnover itself will help him, so that the longer he can hold out the better his chances of victory will be." (*Id.,* at p. 5.) (See also, *Justak Bros. and Co., Inc.* v. *N. L. R. B.* (7th Cir. 1981) 664 F.2d 1074, 1082; *Curlee Clothing Co.* v. *N.L.R.B.* (8th Cir. 1979) 607 F.2d 1213, 1216; *N.L.R.B.* v. *Pacific Southwest Airlines* (9th Cir. 1977) 550 F.2d 1148, 1153; *N.L.R.B.* v. *Henry Colder Company* (7th Cir. 1971) 447 F.2d 629, 630.)

For similar reasons, we approve the ALRB's position that, in determining the propriety of a bargaining order, it need not consider the passage of time or employee turnover which has occurred between the time of the employer's unfair labor practices and the time of the Board's order. Prior to *Gissel,* the Supreme Court had repeatedly held that the NLRB, in deciding whether to issue a bargaining order, could properly ignore events subsequent to the employer's unfair labor practices. (See, e.g., *Labor Board* v. *Katz* (1962) 369 U.S. 736, 748, fn. 16 [8 L.Ed.2d 230, 239, 82 S.Ct. 1107]; *Franks Bros. Co.* v. *Labor Board* (1944) 321 U.S. 702, 704-706 [88 S.Ct. 1020, 1022-1023, 64 S.Ct. 817]; *Labor Board* v. *P. Lorillard Co.* (1942) 314 U.S. 512, 513 [86 L.Ed. 380, 382, 62 S.Ct. 397].) Since *Gissel,* the NLRB has consistently adhered to its position that events subsequent to an employer's unfair labor practices should be ignored. (See, e.g., *Bandag, Incorporated* (1977) 228 NLRB 1045, 1045, fn. 1, enforced (5th Cir. 1978) 583 F.2d 765; *Gibson Products Company* (1970) 185 NLRB 362, 363, sup-

plemented by 199 NLRB 794, enforcement den. (5th Cir. 1974) 494 F.2d 762; cf., *N.L.R.B.* v. *American Cable Systems, Inc.* (5th Cir. 1970) 427 F.2d 446, 448-449; *Clark's Gamble Corporation* v. *N. L. R. B.* (6th Cir. 1970) 422 F.2d 845, 846-847.)

The rationale for the NLRB's position was stated in *Gibson Products Company, supra,* 185 NLRB 362, 363: "[I]n determining whether the employer's unfair labor practices are of such a nature as to preclude a fair election and thus necessitate a bargaining order based on a past card showing of majority status, the situation must be appraised as of the time of the commission of the unfair labor practices, and not currently. For, in virtually every case, by the time a Board decision is reached, there is likely to be sufficient employee turnover and other changes to make it arguable, where the employer has meanwhile refrained from committing new unfair labor practices, that an election held now would be free of the taint of the old unfair labor practices. But, the union and the employees then supporting it were entitled to an election at an earlier time, and, if the employer's original unfair labor practices were of such a nature as to deprive them of an election at that time, to permit one now, when the union's support has been unlawfully dissipated, 'would in effect be rewarding the employer and allowing him "to profit from [his] own wrongful refusal to bargain"' Gissel, supra, 395 U.S. at 610." (*Id.,* at p. 363, fn. omitted.)

The NLRB's policy of refusing to consider "subsequent events" is particularly appropriate in the ALRA context. The agricultural workforce is, in large part, a migratory one. Agricultural employees typically work for several employers during the course of the year and frequently do not work for the same employers from one year to the next. Thus, high employee turnover is inherent in agricultural employment. If agricultural employers could rely on employee turnover to prevent the Board from issuing bargaining orders, employers would have not just an "added inducement" (*Foster, supra,* 418 F.2d at p. 5) but an *absolute* inducement to engage in unfair labor practices in order to prevent a union from obtaining or winning an election, for they could be virtually certain that by the time their case reached the Board, there would be sufficient employee turnover to preclude a bargaining order.

We are mindful of the potential conflict between the Board's position and the ALRA's goal of effectuating employee free choice. Ignoring events that occur between the employer's unfair labor practices and the Board's order will inevitably lead to cases in which a union is certified notwithstanding that only a minority of the workers employed at the time of certification had

signed authorization cards or, worse yet, wished to be represented by the certified union.[26]

However, even in the absence of unfair labor practices and *Gissel* bargaining orders, it is often the case that a majority of the employees at any given time were not employed when the authorization cards were solicited and the election held. In the agricultural context this may well be the rule rather than the exception. Yet the ALRA, and labor law generally, are premised on a legal fiction of sorts that the union elected by past employees is the freely chosen representative of current employees. In addition, it should be remembered, as the court in *Gissel* noted, that "[t]here is, after all, nothing permanent in a bargaining order, and if, after the effects of the employer's acts have worn off, the employees clearly desire to disavow the union, they can do so by filing a [decertification] petition." (*Gissel, supra,* at p. 613 [23 L.Ed.2d at p. 577]; see § 1156.7.)

Finally, it is not at all clear that by considering subsequent events, the Board would actually be promoting the free choice of current employees. Were the Board to adopt a policy of considering subsequent events it would be forced, in almost all cases, to order a rerun election rather than issue a bargaining order. This would effectively remove the threat, and therefore the deterrent value of bargaining orders. Thus, while current workers would be given the chance to have their own election, the employer would be relatively free to interfere with the new election, just as it had with the earlier one.

Given the rapid and extensive worker turnover inherent in agricultural employment, we believe the policies of the ALRA are best served by the Board's position that, in deciding whether to issue a bargaining order, it may properly ignore the passage of time and employee turnover subsequent to the employer's unfair labor practices.

For the foregoing reasons, we conclude that the Board's order in this case was both authorized and appropriate. Let a decree issue enforcing the order of the Board.

Broussard, Acting C. J., Kaus, J., Reynoso, J., and Levins, J.,* concurred.

---

[26]The United States Supreme Court has repeatedly held that the NLRB has authority to issue bargaining orders even where, at the time of the order, the union represents only a minority of the employees. (See *Gissel, supra,* at p. 610 [23 L.Ed.2d at p. 576]; *Franks Bros. Co.* v. *Labor Board, supra,* 321 U.S. at pp. 704-705 [88 L.Ed. at pp. 1022-1023].)

*Assigned by the Chairperson of the Judicial Council.

APPENDIX*

EMPLOYEE INFORMATION CARDS

On March 15, 1977, petitioner began distributing "information cards" which requested that employees disclose their name, address, and social security number. At the bottom of each card was a typewritten statement which read: "I Do WANT []" "I Do NOT WANT []" ". . . the information contained on/in this card to remain confidential." This was followed by a space for the date and employee's signature. Although the cards were printed in both English and Spanish, no explanation for the confidentiality clause was provided. As a result, many employees refused to sign believing that it constituted an attempt to ascertain their union sentiments. Owner, Harry Carian, testified that he had inserted the new clause based on employee request.

■ The ALJ determined that these cards, although innocuous on their face, constituted unlawful interrogation in violation of section 1153, subdivision (a). The Board affirmed this finding. []

[In *Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654 (205 Cal.Rptr. 657, 685 P.2d 701), we recently upheld the Board's finding that another "employee information card" solicitation conducted by HCS violated section 1153, subdivision (a). The cards involved in *Carian* stated that the information requested "may be given by the Agricultural Labor Relations Board to union organizers," and attributed to each employee, through a printed statement above his signature, the pronouncement that he was " 'not willing to supply any information that I have not written on this card.' " (*Id.,* at p. 671.) We upheld the Board's finding that distribution of the cards " 'constitutes interrogation in violation of Section 1153(a) in that the workers were in effect being asked to disclose their attitudes for or against the union by giving or refusing their addresses.' " (*Id.,* at p. 671.)

As we explained in *Carian,* where the issue before the court is whether the ALRB is justified in finding the "employee information cards" to be a form of prohibited interrogation, "that issue does not turn upon whether the employer *intended* them to be interrogative of his employee's attitudes toward the union, or whether he *intended* thereby to coerce or intimidate them [citation omitted], or whether there was evidence that some employees ac-

---

*Text not enclosed by brackets is that of the Court of Appeal. Brackets together, in this manner [], are used to indicate deletions from the opinion of the Court of Appeal; brackets enclosing material are used to denote text drafted in this court.

tually felt coerced or intimidated. The issue turns, rather, upon whether the ALRB could properly find that employees were likely to perceive the language on the cards as calling upon them to indicate, to their employer, whether they wished to have further communication with the union and its organizers." (*Id.*, at p. 672, original italics.)

Although the "information cards" at issue in this case did not include a warning that the information might be given to union organizers, the cards were distributed, with no explanation, during the UFW's intensive organizing campaign. At the same time, the provision allowing employees to request that the information be kept confidential is quite similar to the statement printed on the cards at issue in *Carian* stating that the employee was unwilling to supply certain information.

Under these circumstances, the Board "could properly find that employees were likely to perceive the language on the cards as calling upon them to indicate, to their employer, whether they wished to have further communication with the union and its organizers."[1] (*Id.*, at p. 672.) Accordingly, the Board's finding is affirmed.]

### TERMINATION OF MAYO CREW

On March 28, 1977, employee Vitaliano Mayo and 43 members of his "grape thinning" crew were discharged by petitioner.[2] A UFW organizer testified that the Mayo crew was 85 percent "pro-union." Many members signed authorization cards, participated in UFW projects, donated funds for radio spots, passed out leaflets, and displayed posters. Others joined Cesar Chavez in a union march the day before the discharge. Petitioner asserted unproductivity as the reason for the discharge. Comparative records were introduced which revealed that other crews worked considerably faster than the Mayo crew. Petitioner did not, however, rely on his usual method of gauging productivity and no mass firing of an entire crew had occurred in over 19 years.

The ALJ determined that the motivating reason for the discharge was lack of productivity rather than union sympathy or activity. Accordingly, he refused to find a section 1153, subdivision (a) or (c), violation. The Board rejected this finding.

---

[1]Although not controlling, the Board's finding is supported by evidence that many employees refused to sign the cards, believing that they constituted an attempt by HCS to ascertain union sentiment.]

[2]"Thinning" is a preharvest operation designed to reduce the number of grapes per bunch so that those remaining grow to market standards of size and quality.

■ Section 1153, subdivision (c), of the Act makes it an unfair labor practice for an employer "[b]y discrimination in regard to the hiring or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization." The Board's general counsel has the burden of establishing that the employer has engaged in discriminatory conduct which could have adversely affected employee rights. (*Rivcom Corp.* v. *Agricultural Labor Relations Bd.* (1983) 34 Cal.3d 743, 757-758 [195 Cal.Rptr. 651, 670 P.2d 305].) Among the factors to be weighed in determining the general counsel's prima facie case are the employer's antiunion animus, the timing of the alleged conduct, and the extent to which the employer knew that discharged employees were union sympathizers or activists. Once the prima facie case is established, the burden shifts to the employer to demonstrate that he was motivated by legitimate objectives. If the proffered justifications are not "legitimate and substantial," an unfair labor practice results without reference to intent. (*Id.*)

■ In this instance, the record is replete with evidence of antiunion animus. Petitioner was found to have engaged in a number of unfair labor practices, including unlawful surveillance, interrogation, and threats. These incidents all occurred within a six-week period during a pre-election campaign. Petitioner's knowledge of employee union sympathy or activity may be inferred from the highly visible and vocal activities of the Mayo crew. Finally, the timing of the discharge—one day following a major march by Cesar Chavez in which a member of the Mayo crew was prominently visible—buttresses the suggestion that the discharge was discriminatory.

This evidence clearly establishes a prima facie case of discrimination. Both the ALJ and the Board reached this conclusion. The ALJ, however, accepted petitioner's stated justification, while the Board rejected it.

[] The "substantial evidence" standard is not modified when the Board and ALJ disagree. If the Board "can point to evidence" which supports its inference and if this evidence is "substantial" when measured against the ALJ's contrary findings as well as the opposing evidence, its finding must be upheld. (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 336 [165 Cal.Rptr. 887]; *Penasquitos Village, Inc.* v. *N.L.R.B.* (9th Cir. 1977) 565 F.2d 1074, 1078.) In this instance, the Board in rejecting the ALJ's finding of economic justification indicated the evidentiary reasons for this rejection. It noted the production records allegedly relied on by the petitioner contained a number of discrepancies and dealt this evidence a fatal blow by pointing out that these records were not received by the petitioner until after the termination of the Mayo crew. We, therefore, affirm the Board's unfair labor practice finding.

## Wage Increase

On March 29, 1977, one day after the Mayo crew had been fired and two days after a UFW-sponsored march through the Coachella Valley, petitioner conferred a wage increase on all workers (from $2.70 per hour to $3.15 per hour). The raise was communicated to workers in two ways: by anti-union leaflet, and by supervisor Jose Castro who also informed them that petitioner would raise wages to $3.40 if the union went that high. Petitioner characterized the pay raise as a merit increase which had been discussed well in advance of its announcement.

■ The ALJ determined that petitioner's conduct constituted unlawful interference in violation of Labor Code section 1153, subdivision (a). The Board affirmed this finding.

Conduct immediately favorable to employees may constitute a section 1153, subdivision (a), violation in the same manner and degree as threats. (*Labor Board* v. *Parts Co.* (1964) 375 U.S. 405, 409 [11 L.Ed.2d 435, 438, 84 S.Ct. 457].) " 'Interference is no less interference because it is accomplished through allurements rather than coercion.' " (*National Labor Relations Board* v. *Crown Can Co.* (8th Cir. 1943) 138 F.2d 263, 267 [quoting *Western Cartridge Co.* v. *National Labor Relations Board* (7th Cir. 1943) 134 F.2d 240, 244].) Despite petitioner's arguments to the contrary, the absence of a formally pending election petition does not alter this result. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 840 [161 Cal.Rptr. 870].) The test is whether the benefits promised or conferred are intended to and do interfere with workers' organization rights. (*Id.*) Given the fact that the grant of benefits was presented in an employer speech and leaflet at the peak of a preelection campaign, one day after the firing of an entire crew, and two days after a widely publicized UFW march, there can be little room for doubt that the increase was made to induce employees to vote against the union. Accordingly, the Board's finding is affirmed.

## Threat of Discharge

On March 30, 1977, organizer Sullivan entered one of petitioner's labor camps and distributed union leaflets to workers. A number of workers read the leaflets and began conversing about the contents. Sullivan testified that shortly thereafter, supervisor José Castro picked up a leaflet, threw it down angrily, and stated "they're going to fire us all." Sullivan's handwritten chronology of alleged violations, prepared for the purpose of filing unfair labor practices, did not refer to the leaflet-throwing incident. No witnesses

corroborated the alleged threat and Castro denied ever having threatened employees with discharge.

Although the ALJ found Sullivan to be credible, he declined to find a violation of section 1153, subdivision (a), based on the absence of corroborating testimony and the omission of the alleged incident from Sullivan's chronology. The Board refused to adopt the ALJ's finding and, relying on Castro's general denial, concluded that his statement contained an implied threat of discharge.

In determining that Castro uttered the challenged statement, the Board has made a credibility resolution which will not be disturbed on appeal. The fact the statement was made does not, however, end our inquiry. ■ We must still determine whether the Board could properly conclude Castro's statement reasonably tended to interfere with the free exercise of employee rights under the Act.

A review of the record as a whole reveals the statement was not isolated. The Board found Castro had on other occasions threatened employees (18th and 30th of March). Each of these incidents, including the statement at issue, was made during union organizational activities. In this context, Castro's statement could be construed as part of a systematic pattern of threats and intimidation that would reasonably tend to interfere with and restrain employees in the exercise of section 1152 rights. The Board's finding is affirmed.

### Surveillance by Supervisor Robles

On March 31, 1977, Father Tobin, an organizer for the UFW ministry entered one of petitioner's labor camps with three coorganizers and began speaking with a number of employees. Supervisor Filiberto Robles approached, stood behind the group for two to three minutes, said nothing, and left. Seven minutes later, Robles repeated this process. The employees ceased conversing upon his first appearance and departed when he returned. Father Tobin then proceeded to a second camp, accompanied by the same organizers, where he again encountered Robles. After standing by silently as the organizers talked with workers, Robles eventually queried whether they were "going to stay . . . all night." Robles denied ever approaching the workers when they were talking to union organizers.

■ The ALJ credited Father Tobin's testimony and based on his statements determined that Robles had violated section 1153, subdivision (a), by engaging in unlawful surveillance. The Board affirmed this finding.

Surveillance of employee activities which has a reasonable tendency to affect the exercise of their section 1152 rights constitutes an unfair labor practice. (*Merzoian Brothers Farm Management Co., Inc.* (1977) 3 ALRB No. 62, p. 3.) Such surveillance is present when a supervisor intentionally interjects his presence and listens to conversations between organizers and workers. (*Dan Tudor & Sons* (1977) 3 ALRB No. 69, p. 2.) Based on a review of supervisor Robles' actions in this instance, we conclude that substantial evidence exists to support the Board's finding.

Petitioner asserts that the presence of Robles in "common areas" should alter our determination. This contention is not, however, supported by applicable precedent. (See *N. L. R. B.* v. *Aero Corp.* (5th Cir. 1978) 581 F.2d 511, 512 [supervisor's presence in a public park did not preclude a finding of unlawful surveillance]; *N.L.R.B.* v. *Speed Queen* (8th Cir. 1972) 469 F.2d 189, 191 [supervisor's presence in a supermarket parking lot did not preclude a finding of unlawful surveillance].) The Board's unfair labor practice finding is, therefore, affirmed.

### THREAT OF DEPORTATION

On April 6, 1977, Rosa Zendegas, one of petitioner's employees, overheard supervisor Filiberto Robles admonish two workers not to sign union authorization cards. In connection with the admonition, Zendegas recalled that Robles stated: "We know you are illegal, and the rancher will get you out or fire you. If not, immigration will get you or we will get immigration to take care of you." Robles did not specifically deny making such statements.

Although the ALJ found Zendegas to be credible, he determined that because the statements were not directed at her, she could not characterize them as serious or in jest. Accordingly, the ALJ declined to find coercion in violation of section 1153, subdivision (a). The Board reached the opposite conclusion.

■ Whether employer statements are coercive is normally a question peculiarly within the discretion of the Board "because of its particular sensitivity to the effects of speech in the labor . . . context." (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 327 [165 Cal.Rptr. 887].) In this instance, after considering the context in which Robles' statements were made and the widespread illegal conduct by petitioner, the Board concluded that these statements were not innocuous but rather constituted coercive threats designed only to discourage union participation. The Board also noted that the testimony of those individuals who

were the specific targets of these threats would have added nothing to inferences that could already be drawn from all the surrounding circumstances. This delineation of evidentiary reasons for its unfair labor practice finding, coupled with the Board's wide discretion in this area, requires that we affirm that finding.

### APRIL 6TH & 7TH LAYOFFS

On April 6 and 7, 1977, petitioner refused to continue in its employ 38 agricultural workers. According to testimony elicited, all of these workers were visible and active supporters of the UFW. Petitioner testified, however, that the layoffs were not based on the workers' union affiliation, but rather, on a need for a reduced work force dictated by the end of the thinning season.

The ALJ rejected petitioner's proffered business justification and determined that the employees had been discriminatorily discharged in violation of section 1153, subdivisions (a) and (c). The Board affirmed this finding.

Discriminatory layoffs are prohibited in the same manner as discriminatory discharges. (See *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 937-939 [156 Cal.Rptr. 152].) Although petitioner maintained that the layoff was necessitated by a need for a reduced work force, the Board's finding of antiunion animus is supported by "substantial evidence." The proffered justification is undermined by petitioner's admitted practice of retaining employees past the thinning operation and into the harvest season, and by its own payroll records which indicate that full crews were working within two weeks from the date of the layoffs. Accordingly, we affirm the Board's finding.

### [] THREAT OF REFUSAL TO HIRE IN THE FUTURE

On June 6, 1977, Alberto Martinez, a harvest worker, and Lucy Crespin, a UFW organizer, were conversing with another employee. As the employee took a pen and began to sign an authorization card, supervisor Jose Castro angrily told him not to sign and to get back to work. Martinez and Crespin proceeded to talk to other workers, and Castro left. Castro later told Martinez and his brother and sister-in-law that he would not hire them in the future because he now knew they were union organizers.

The ALJ determined that Castro had unlawfully threatened the Martinez family in violation of section 1153, subdivision (a). The Board affirmed this finding.

■ Petitioner argues that the Board erred in affirming because (1) the testimony of Martinez did not corroborate that of his sister-in-law, and (2) both individuals sought employment with petitioner primarily to assist the UFW's organizing efforts. After reviewing the record, we conclude that "substantial evidence" exists to support the Board's finding. Although inconsistencies are present in the testimony of the principal witnesses, these inconsistencies are minor and insufficient to cast doubt on the substance of their testimony. In addition, regardless of their motive in seeking employment with petitioner, both the ALJ and the Board chose to credit their testimony. Because that testimony is neither "incredible [n]or inherently improbable," we are bound by the Board's credibility resolution. [] (See, *ante,* at p. 220.) []

### SURVEILLANCE BY ROBERT CARIAN

On June 6, 1977, Jesus Munoz, a UFW organizer, entered petitioner's property during a de facto lunch period. As he began to converse with employee Juan Garza, Robert Carian, the son of owner Harry Carian, approached and stood about one yard away, observing them. After a few minutes, Munoz left and Carian followed him. Munoz next talked to employee Antonio Bielma, who was about to sign a union authorization card when Carian once again approached. Bielma stated to Munoz, "How do you think we can sign with Robert Carian applying the pressure." Later that day, Carian approached when Munoz was talking to employee Manuel Bielma about signing an authorization card. Although Bielma eventually signed the card, he refused to do so at that time. Carian testified that he was present in the area, but was merely checking grapes.

The ALJ determined that Robert Carian was present for the express purpose of observing and/or overhearing conversations between the organizers and employees. Consequently, he found that Carian had engaged in unlawful surveillance in violation of section 1153, subdivision (a). The Board affirmed this finding.

Petitioner asserts that the Board improperly failed to consider contradictions in the testimony of Jesus Munoz and Juan Garza and give those contradictions appropriate weight. Placed in its proper framework, this argument resolves into yet another challenge to the Board's credibility resolutions. Because the Board chose to credit the testimony of Munoz and Garza and because this testimony, despite minor discrepancies, is not "incredible or inherently improbable," we must accept it as accurate. [] (See, *ante,* at p. 220.) [] Accordingly, we find "substantial evidence" to support the Board's finding.

## VIOLENT ACTIVITIES OF ROBERT CARIAN

On June 7, 1977, Robert Carian hit a UFW organizer's car with his pickup truck. On that same date, he seized a UFW organizer and spun him around in order to see his union identification badge. On June 8, 1977, Carian rammed a UFW organizer's car with a company tractor and assaulted a bodyguard of UFW president Cesar Chavez.

With respect to each incident, the ALJ found that Carian had unlawfully interfered with agricultural employees in violation of section 1153, subdivision (a). The Board affirmed each finding.

 " 'Absent compelling evidence of an imminent need to act to secure persons against danger of physical harm or to prevent material harm to tangible property interests,' " physical confrontations between union and employer representatives are violations of the Act. (*Vista Verde Farms* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 307, 316 [172 Cal.Rptr. 720, 625 P.2d 263], quoting *Tex-Cal Land Management, Inc.* (1977) 3 ALRB No. 14, p. 11, affd. *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579].) We have reviewed the record carefully, and conclude that none of the violations charged in this instance involved an imminent need to secure persons from physical harm or property from material harm. The Board's finding, therefore, is affirmed.[3]

### JUNE 17TH LAYOFFS

On June 17, 1977, petitioner laid off all harvesting employees except those living in its labor camps. Each of the 13 individuals affected were visible union supporters. Petitioner proffered a legitimate business reason for the layoffs. Owner, Harry Carian, specifically asserted that fewer employees were needed for the upcoming harvest. Although Carian admitted that this was the first year he had resorted to layoffs, he testified that in previous years workers had left voluntarily.

The ALJ determined that petitioner had discriminatorily discharged the employees in violation of section 1153, subdivisions (a) and (c). The Board affirmed this finding.

---

[3]In upholding these findings, we reject petitioner's arguments that Carian's actions were justified on the basis of alleged UFW access violations. We do acknowledge that by taking excess access the union encourages and promotes violence; violence cannot, however, be condoned as an appropriate response.

Petitioner argues that by rejecting its proffered business justification, the Board improperly discredited Carian's testimony. As we have noted twice previously in the course of this opinion, we are required to accept the Board's credibility resolutions and any derivative finding unless it has chosen to credit testimony which is "incredible or inherently improbable." []
(See, *ante,* at p. 220 []) Since the Board did not, in this instance, credit such testimony, we conclude that its finding must be affirmed.

PRINTED INSULTS

In June of 1977, petitioner began printing and distributing leaflets among the workers. One leaflet contained a thinly disguised message likening female organizers to prostitutes.

The ALJ found that this leaflet constituted unlawful interference in violation of section 1153, subdivision (a). The Board affirmed this finding.

 Relying on the mandate set forth in section 1155,[4] petitioner argues that the leaflet is protected speech because it contains no threat of reprisal or force, or promise of benefit. Section 1155 was modeled after and is analogous to section 158(c) of the National Labor Relations Act.[5] This latter statute was enacted to encourage free debate on issues dividing labor and management. It was not, however, designed to permit either a union or employer to maliciously libel [its] opponents. (*Linn* v. *Plant Guard Workers* (1966) 383 U.S. 53, 62-63 [15 L.Ed.2d 582, 589, 86 S.Ct. 657].) Consequently, despite the limitations imposed by section 158(c), the NLRB has found that certain expressions of views by an employer, though not involving a threat or promise of benefit, constitute unfair labor practices. In *Wolfie's* (1966) 159 NLRB No. 7, for example, an employer's reference to his employees as waitresses who had been taken off the street was construed as a section 8, subdivision (a)(1), violation. Petitioner's leaflets, in this instance, insult and degrade union organizers in a like manner. Conduct such as this has a natural tendency to cause employees to shun and avoid the union and persons affiliated therewith, thus interfering with the rights afforded by section 1152 of the Act. Accordingly, the Board's decision is affirmed.

---

[4]Section 1155 provides: "The expressing of any views, arguments, or opinions, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute evidence of an unfair labor practice under the provisions of this part, if such expression contains no threat of reprisal or force, or promise of benefit."

[5]Section 158(c) provides: "The expressing of any views, argument, or opinion or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit."

## Election Eve Promises

On election eve, June 26, 1977, Harry Carian, accompanied by supervisor Jose Castro, visited one of petitioner's labor camps. With all the workers assembled in the camp kitchen, Carian delivered a speech in which he expressed a preference for no union and enumerated the current benefits. When he had finished, an employee complained about conditions at two of petitioner's ranches. Carian promised that the conditions would be corrected and promised, in addition, higher wages.

The ALJ determined that Carian's postspeech statements promising incidental benefits constituted unlawful interference in violation of section 1153, subdivision (a). The Board affirmed this finding.

Section 1155 of the Act (see, *ante,* at p. 250, fn. 4) specifically authorizes and allows employers to voice their opposition to unions in the form of argument, opinions, or written material. Such activities only constitute unfair labor practices when the expressions utilized contain threats of reprisal or force or promises of benefit. With respect to benefits promised or conferred, the test is whether those benefits are intended to and do interfere with workers' organizational rights. (*Royal Packing Co.* v. *Agricultural Labor Relations Bd.* (1980) 101 Cal.App.3d 826, 840 [161 Cal.Rptr. 870].) Given the fact that the promises, in this instance, closely preceded the election and were made in the context of Carian's attempt to persuade employees to vote against the union, it must be concluded there is "substantial evidence" to support the Board's finding.

## Uncharged Incidents

On June 8, 1977, Robert Carian forced a UFW organizer's car to stop by swerving in front of it with his pickup truck. During that same month, Carian approached UFW organizer Lucy Crespin on four separate occasions and asked her how much she charged for a trick. He also stated that she would make a good bed partner. Workers were present and heard Carian's comments on each occasion. Although neither of these incidents was charged in the complaint, the Board found that they were intertwined with allegations contained therein and fully litigated at the hearing. The Board specifically noted that the swerving incident was related to the June 8, 1977, tractor incident (see, *ante,* at p. 249), and the vulgar insults were related to the June leaflet incident (see, *ante,* at p. 249).

A violation not alleged in the complaint may nevertheless be found when the unlawful activity was related to and intertwined with allegations

in the complaint and the matter fully litigated. (*Doral Hotel and Country Club* (1979) 240 NLRB 1112.) The incidents at issue here, however, are not sufficiently intertwined with any of the incidents charged. By alleging in the complaint that Carian had rammed a UFW organizer's car with a tractor on June 8, petitioner was not apprised of the need to defend against a vehicle-swerving incident. Similarly, the allegation in the complaint concerning the printed leaflets did not apprise petitioner that it would be required to defend against Carian's vulgar insults. Even if the incidents had been said to be intertwined with those charged in the complaint, petitioner had no way of fathoming whether Carian's conduct on these two occasions was merely being considered as a factor in setting aside the election or as unfair labor practices in and of itself. Consequently, petitioner had no opportunity to gather evidence or prepare legal arguments refuting the occurrence of such violations. Fundamental fairness includes both the right to adequate notice and the right to defend against charged violations. The Board's finding that these two incidents constituted independent unfair labor practices was, therefore, contrary to elementary constitutional principles of procedural due process and must be set aside. (See *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 933-934 [156 Cal.Rptr. 152].)

**MOSK, J.**—I dissent.

It is difficult to be objective about an employer that has consistently engaged in egregious unfair labor practices designed to prevent collective bargaining. But the duty of this court is to consider and be bound by relevant statutes. My colleagues have succumbed to the temptation to rewrite the Agricultural Labor Relations Act (ALRA) in order to take what they consider appropriate punitive action against this one farm employer. I resist that temptation.

We are guided in our application of the ALRA by well-settled tenets of statutory construction. First, " 'It is a settled principle in California law that "[w]hen statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it." ' [Citations.]" (*In re Lance W.* (1985) 37 Cal.3d 873, 886 [210 Cal.Rptr. 631, 694 P.2d 744].) Section 1156 of the Labor Code provides that "Representatives designated or selected *by a secret ballot* for the purposes of collective bargaining by the majority of the agricultural employees in the bargaining unit shall be the exclusive representatives . . . ." (Italics added.) Section 1156.3 details the procedures for union elections and Agricultural Labor Relations Board (ALRB) certification following those elections. Section 1159 declares in part that "only labor organizations certified pursuant to this part shall be parties

to a legally valid collective-bargaining agreement.'' It would be difficult to conceive of a clearer statutory scheme mandating secret ballot elections as the only method by which agricultural employees' bargaining agents are to be selected.

The majority breach this longstanding principle of statutory construction and stretch the plain language of the ALRA for the purpose of justifying their punitive action against the employer. But even if we were to disregard the plain language of the statute, the majority's holding would find no support. This is so because a second well-settled rule declares that ''In construing constitutional and statutory provisions, whether enacted by the Legislature or by initiative, the intent of the enacting body is the paramount consideration. [Citations.]'' (*In re Lance W., supra,* 37 Cal.3d at p. 889.) I need only borrow quotations from the majority opinion to demonstrate the straightforward intent of the proponents and of the legislators who enacted the ALRA: ''[U]nder our Act, we only allow one way of recognition and that's through a secret ballot election.'' (Hg. before Sen. Industrial Relations Com., May 21, 1975, p. 51, comments of then Secretary of Agriculture and Services Bird.) ''[T]here is a secret ballot [election] in all cases. . . .'' (*Id.,* at p. 59, coms. of Sen. Dunlap.) ''[A]bove all else, [the ALRA] requires secret ballot elections in every instance.'' (Hg. before Assem. Com. on Labor Relations, May 12, 1975, p. 2, coms. of Assemblyman Berman.)

The majority leap over these absolute, unqualified statements by the ALRA's authors and major supporters and settle on a rule of construction they believe justifies their desired result. They urge that we must read the statute in a manner that will promote the purposes of the law, and cite to the act's preamble and broad statement of policy. (Stats. 1975, Third Ex. Sess., ch. 1, § 1, p. 4013; Lab. Code, § 1140.2.) But these sections do not support their holding either, because a third settled rule decrees that specific statutes prevail over such general provisions. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 420 [128 Cal.Rptr. 183, 546 P.2d 687].) Thus we come back, once again, to the unambiguous sections of the ALRA that specifically prescribe secret ballot elections as the exclusive means to obtain ALRB certification of a union. (Lab. Code, § 1156 et seq.)

The majority rely on *NLRB* v. *Gissell Packing Co.* (1969) 395 U.S. 575 [23 L.Ed.2d 547, 89 S.Ct. 1918]. However, *Gissell* is clearly inapposite because it involves the National Labor Relations Act (NLRA), a statute different from the ALRA in a most fundamental respect. Section 9(a) of the NLRA provides that ''Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit

. . . shall be the exclusive representatives . . . for the purposes of collective bargaining. . . ." Because section 9(a) does not "specify[] precisely how [the] representative is to be chosen, it was early recognized that an employer had a duty to bargain whenever the union representative presented 'convincing evidence of majority support.'" (*Gissell, supra,* 395 U.S. at p. 596 [23 L.Ed.2d at p. 568].) In contrast, the ALRA clearly specifies how a representative is to be chosen—by a secret ballot election, and only by that means.

The majority attempt to rationalize away this fundamental distinction by explaining that the bargaining order in *Gissell* issued as a result of the employers' unfair labor practices. Thus the bargaining order was a remedy, under NLRA section 8(a)(5), for the unfair labor practices, rather than a recognition decision under section 9. Similarly, urge the majority, the ALRB has broad authority to remedy unfair labor practices. Thus, they contend, the ALRB may issue a *Gissell*-type bargaining order as such a remedy.

This argument blithely overlooks the fact that it is because of the NLRA's ambiguity as to the method of selecting bargaining representatives that the National Labor Relations Board (NLRB) may issue bargaining orders as a remedy. "Since § 9(a) . . . refers to the representative as the one 'designated or selected' by a majority of the employees without specifying precisely how that representative is to be chosen, . . . [a]lmost from the inception of the Act . . . it was recognized that a union did not have to be certified as the winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means under the unfair labor practice provision of § 8(a)(5) . . . ." (*Gissell, supra,* 395 U.S. at pp. 596-597 [23 L.Ed.2d at p. 568].)

The disparity between the federal act and our own is thus readily apparent. Because the former provides no guidance on how a representative is to be chosen, the NLRB may designate a representative as a remedy for the employer's unfair labor practices. The ALRA, however, clearly prohibits recognition of an organization as representative unless that organization has won a secret ballot election. It follows that the ALRB may not designate a representative.

The majority overlook the fact that *Gissell* was decided six years before the ALRA hearings. Thus the authors and supporters of the California statute were well aware of the federal remedy, and chose not to prescribe it.

However attractive it might appear to ignore the terms of a precise statute, we are not permitted to indulge in that fantasy. The late Chief Justice Wright

often quoted A.P. Herbert on statutory interpretation: "If Parliament did not mean what it said, why did it not say so?"

I do not mean to condone the activities of employers who would undermine proper labor organizational activities. But we sit as a court, not as a legislative body, and we must adhere to statutory mandates no matter how tempting it may be to disregard our duty in order to reach an appealing result. The board's order exceeded its jurisdiction and should be annulled.

Lucas, J., concurred.